LOCKRIDGE GRINDAL NAUEN P.L.L.P.
REBECCA A. PETERSON (241858)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rapeterson@locklaw.com

Lead Counsel for Plaintiffs

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE BIG HEART PET BRANDS LITIGATION<br><br>This document relates to:<br>ALL ACTIONS | Lead Case No. 4:18-cv-00861-JSW<br><br>(Consolidated with Nos. 4:18-cv-01465; 4:18-cv-01466; 4:18-cv-01099; 4:18-cv-01663; and 4:18-cv-02662)<br><br>Hon. Jeffrey S. White<br><br>**THIRD**SECOND **AMENDED CONSOLIDATED COMPLAINT**<br><br>**CLASS ACTION**<br><br>DEMAND FOR JURY TRIAL |

1.     Plaintiffs ~~Maclain Mullins,~~ Thomas Roupe, Neil Sebastiano, Nancy Sturm, Kathy Williamson, Jeremy Wahl, Norman Todd, Betty Christian, ~~Aubrey Thomas, Joyce Brown,~~ Roberta Mayo, Jack Collins, ~~Vivian Jilek,~~ and Rosemarie Schirripa (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Third Amended Consolidated Complaint against defendant Big Heart Pet Brands, Inc. ("Defendant"), to cause Defendant to disclose that its pet food sold throughout the United States is adulterated and contains pentobarbital and to restore monies to the consumers and businesses who purchased the Contaminated Dog Foods (as defined herein) during the time that Defendant failed to make such disclosures. Plaintiffs also seek to bar Defendant from selling any dog food that contains any levels of pentobarbital. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel and as to all other matters, upon information and belief (Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery).

**DEFENDANT'S CONTAMINATED DOG FOODS ARE ADULTERATED BECAUSE THEY CONTAIN PENTOBARBITAL, A SUBSTANCE LARGELY USED TO EUTHANIZE ANIMALS**

2.     Defendant manufactures, markets, advertises, labels, distributes, and sells Gravy Train Chunks in Gravy with Beef Chunks, Gravy Train with Beef Chunks, Gravy Train Chunks in Gravy with T-Bone Flavor Chunks, Gravy Train with T-Bone Flavor Chunks, Gravy Train Chunks in Gravy with Chicken Chunks, Gravy Train with Chicken Chunks, Gravy Train Strips in Gravy Beef Strips, Gravy Train Chunks in Gravy with Lamb & Rice Chunks, Gravy Train Chunks in Gravy Stew, Gravy Train Meaty Ground Dinner with Beef and Bacon, and Gravy Train Chicken, Beef, Liver Medley and the following Kibbles 'n Bits® products: Chef's Choice Bistro Hearty Cuts with Real Beef, Chicken & Vegetables in Gravy; Home-style Tender Slices with Real Beef, Chicken & Vegetables in Gravy; Bistro Tender Cuts with Real Beef & Vegetables in Gravy; Home-style Meatballs & Pasta Dinner with Real Beef in Tomato Sauce; Chef's Choice Bistro Tender Cuts with Real Turkey, Bacon & Vegetables in Gravy; and American Grill Burger Dinner

with Real Bacon & Cheese Bits in Gravy (the "Contaminated Dog Foods").[1]  The Contaminated

Dog Foods contain pentobarbital, a barbiturate drug used as a sedative and anesthetic for animals,

rendering it adulterated under relevant federal and state law.  Pentobarbital is now most commonly

used for euthanizing animals.

3.     Pentobarbital is a Class II controlled substance, and there is no safe or set level for

pentobarbital in pet food.  If it is present, the food is adulterated.[2]  The ingestion of pentobarbital

by your pet can lead to adverse health issues, including:

- Tyalism (salivation)
- Emesis (vomiting)
- Stool changes (soft to liquid stools, blood, mucus, urgency, explosive nature, etc.)
- Hyporexia (decreased appetite)
- Lethargy/depression
- Neurologic abnormalities (tremor, seizure, vocalization, unusual eye movements)
- Ataxia (difficulty walking)
- Collapse
- Coma
- Death[3]

4.     Despite laws governing pet foods and providing government oversight, "[p]et food

manufacturers are responsible for taking appropriate steps to ensure that the food they produce is

safe for consumption and properly labeled" including "verify[ing] the identity and safety of the

ingredients they receive from suppliers."[4]

5.     "It is not acceptable to use animals euthanized with a chemical substance in pet or

other animal foods.…  The detection of pentobarbital in pet food renders the product adulterated.

---

[1] Discovery may reveal additional products that also contain pentobarbital and Plaintiffs reserve the right to include any such products in this action.

[2] http://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm544348.htm

[3] The Honest Kitchen, "Pentobarbital—What Is It, How It Entered the Pet Food Supply Chain, and What You Can Do to Protect Your Canines & Felines" (Mar. 1, 2017), *available at* https://www.thehonestkitchen.com/blog/pentobarbital-entered-pet-food-supply-chain-can-protect-pet/

[4] https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm544348.htm (last visited Apr. 27, 2018)

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

It is the responsibility of the manufacturer to take the appropriate steps to ensure that the food they produce is safe for consumption and properly labeled."[5]

6. Pentobarbital residue from euthanized animals will continue to be present in pet food, even if it is rendered or canned at a high temperature or pressure.[6]

7. Pentobarbital is routinely used to euthanize animals, and the most likely way it could get into dog food would be through rendered animal products. Rendered products come from a process that converts animal tissues to feed ingredients, which may include animals that were euthanized, decomposed, or diseased. Pentobarbital from euthanized animals survives the rendering process and could be present in the rendered feed ingredients used in pet food.

8. It is not acceptable to use animals euthanized with a chemical substance in pet food, and the detection of pentobarbital in pet food renders the product adulterated.

9. Historically, the FDA has not aggressively taken action under section 342(a)(1) or (5) of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, *et seq*. ("FDCA"), against the pet food companies that it found to have used non-slaughtered animals and sold pet food containing pentobarbital. Therefore, manufacturers in the pet food industry, including Defendant, have continued their illegal practice of using non-slaughtered animals that may contain poisonous substances, like pentobarbital, in their pet foods.

10. It was recently revealed that Defendant was knowingly, recklessly and/or negligently selling Contaminated Dog Foods containing pentobarbital, a substance largely used to euthanize animals.

11. On February 8, 2018, it was reported on WJLA, an ABC network affiliate in Washington, D.C., that an independent investigation determined that the Contaminated Dog Foods contained pentobarbital. The independent investigation utilized two different labs and both

_____

[5] *Id.*

[6] *Id.*

showed that the Contaminated Dog Foods tested positive for pentobarbital. In fact, it was the only brand that tested positive for pentobarbital.[7]

12.     The report further stated that pentobarbital is not used on farm animals and questioned where the pentobarbital is coming from if it is not from euthanized dogs, cats, or horses. Defendant did not respond to the specific questions raised and instead stated in a press release: "We launched and are conducting a thorough investigation, including working closely with our suppliers, to determine the accuracy of these results and the methodology used."[8]

## REACTIONS TO THE NONDISCLOSURE AND MATERIALITY OF THE PRESENCE OF PENTOBARBITAL IN THE CONTAMINATED DOG FOODS

13.     Shortly after the public exposure of the fact that the Contaminated Dog Foods contained levels of pentobarbital, Defendant issued a statement assuring consumers, including Plaintiffs and the proposed Classes, that it was "confident in the safety of our products and do not believe you [a consumer] need to take any action at this time." Exhibit A at 1.

14.     In this same statement, Defendant admitted that pentobarbital is "not something that is added to pet food. However, it could unintentionally be in raw materials provided by a supplier. We regularly audit our suppliers and have assurances from them about the quality and specifications of the materials they supply us. Raw materials that include pentobarbital do not meet our specifications." Exhibit A at 2.

15.     However, Defendant later officially withdrew certain products from the marketplace and altered this press release by removing the statements. Exhibit B.

16.     Defendant further altered the press release by removing its statement that it follows the American Association Feed Official (AAFCO) standards. *Compare* Exhibit A at 2 and Exhibit B at 2.

---

[7]  http://wjla.com/features/7-on-your-side/fda-to-investigate-after-abc7-exposes-euthanasia-drug-in-dog-food

[8]  *Id.*

17.     The same press release also deleted Defendant's previous representation that it was not associated with the Evanger's Brand, a dog food Company that recalled adulterated dog food based on the presence of pentobarbital in early 2017. *Contrast* Exhibit A and Exhibit B.

18.     These changes to the press release suggest that Defendant knew the Contaminated Dog Foods contained pentobarbital.

19.     Within days of the public revelation that the Contaminated Dog Foods contain pentobarbital, Defendant voluntarily withdrew twenty-seven products, including the Contaminated Dog Foods. The voluntary withdrawal included the additional brands of Kibbles 'n Bits®, Skippy, and Ol' Roy.

20.     On February 16, 2018, the FDA issued an alert to consumers addressing the voluntarily withdrawal of certain products by Defendant. In this alert, the FDA states: "The FDA's preliminary evaluation of the testing results of Gravy Train samples indicates that the low level of pentobarbital present in the withdrawn products is unlikely to pose a health risk to pets. However, pentobarbital should never be present in pet food and products containing any amount of pentobarbital are considered to be adulterated."[9]

21.     The FDA alert further states: "Pentobarbital is a barbiturate drug that is most commonly used in animals as a sedative, anesthetic, or for euthanasia. The FDA's preliminary evaluation of the testing results of Gravy Train samples indicates that the low level of pentobarbital present in the withdrawn products is unlikely to pose a health risk to pets. However, any detection of pentobarbital in pet food is a violation of the Federal Food, Drug, and Cosmetic Act—simply put, pentobarbital should not be in pet food. The FDA is investigating to learn the potential source and route of the contamination."[10]

22.     Defendant issued a press release on February 23, 2018, stating that it identified the source of the pentobarbital through "[t]esting done by scientists at an independent, third-party

---

[9] https://www.fda.gov/animalveterinary/newsevents/ucm597135.htm

[10] *Id.*

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

microbiology laboratory." Defendant stated that the testing found "a single ingredient (beef fat) was the source of the contamination." Exhibit C.

23.     Defendant did not identify what exactly was tested—whether it was cans of the food pulled from the shelves, cans shipped directly from the manufacturing plant, and/or isolated samples of beef fat from the supplier. Defendant did claim the tested beef fat was sourced from cattle from the United States. However, Defendant has offered no information about how it identified this particular ingredient or whether it tested any other ingredients included in the recalled pet foods. *See* Exhibit C. Additionally, beef fat is not an ingredient listed on the label of any of the Contaminated Dog Foods.[11]

24.     Defendant also did not specify what animals they tested the Contaminated Dog Foods for beyond cattle. When doing DNA testing, it must be determined beforehand what species will be looked for (i.e. dog, cat, cattle, horse, etc.). Defendant has not disclosed whether its testing looked for dog, cat, or horse DNA.

25.     In the February 23, 2018, press release, Defendant admitted that the "presence [of pentobarbital] at any level is not acceptable and is not up to our quality standards." Exhibit C.

26.     Defendant updated this statement on March 2, 2018, now claiming that the laboratory tests confirm the contaminated animal fat was "from cow, pig and chicken and no other animal of the nine types tested." Once again, Defendant did not identify what types of animals were included in that testing. Exhibit D.

27.     Defendant has yet to disclose the name of the manufacturing plant and/or supplier that it references as the suspected source of the contaminated raw materials containing pentobarbital.

28.     On March 2, 2018, Defendant further changed its statements regarding the "source of contamination." The type of animal fats the Defendant now claims are the sources of pentobarbital in the Contaminated Dog Foods was expanded to include pig and chicken fat and

---

[11] http://wjla.com/features/7-on-your-side/fda-investigation-continues-into-dog-food-contaminated-with-euthanasia-drug

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

"no other animal of the nine types tested." However, Defendant has still failed to disclose the nine sources tested.

29. In addition, Defendant further edited its February 23, 2018, press release by changing from a "voluntary withdrawal" of the specific products to a "class III recall."[12]

30. On March 2, 2018, the FDA formally issued a recall for the Contaminated Dog Foods "based … on a test by [Defendant] confirming the presence of pentobarbital in the tallow ingredient used in the affected products."[13] The FDA is continuing to investigate the Contaminated Dog Foods.

31. Consumers have also reacted to the news of Defendant allowing its products to be sold with no disclosure of the inclusion of pentobarbital or reference that its products are tested to ensure that they are not adulterated. Indeed, social media comments highlight that a reasonable consumer, like Plaintiffs and the Classes, had no idea that they may be feeding their beloved pet adulterated food and it is something they believe should have been disclosed to the public.

**THE STAGGERING REALITY OF THE EXTENT OF THE CONTAMINATION COULD HAVE BEEN PREVENTED IF DEFENDANT FOLLOWED ITS OWN TOUTED QUALITY AND SUPPLIER STANDARDS**

32. In the end, ***over ninety million cans*** of food manufactured and distributed by Defendant were recalled because of the inclusion of pentobarbital.

33. Moreover, the testing results showed alarmingly high levels of pentobarbital in the tallow. Specifically, the current supply tested showed levels ranging from 801 ppb to 852 ppb, and the retained sample from 2017 contained pentobarbital at the level of 529 ppb.

34. Despite this, Defendant has publicly represented that the testing showed "extremely low levels of pentobarbital," but claimed such levels "do not pose a threat to pet safety." Defendant has failed to disclose or acknowledge the testing results that showed the high levels of pentobarbital in the tallow.

---

[12] *Id.*

[13] https://www.fda.gov/AnimalVeterinary/NewsEvents/ucm597135.htm

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

35.    Indeed, Defendant has known of the FDA's zero tolerance stance with respect to pentobarbital contamination since at least May 2017. This position was fortified when the FDA told Defendant that its "cooperation in this matter is important *to the protection of the general public*" and formally advised Defendant that a recall was necessary based on the "finding of pentobarbital in tallow used as an ingredient."

36.    Defendant claims that the source of contaminated tallow comes from one supplier—JBS USA Holdings, Inc. (a subsidiary of JBS S.A.) and its rendering facility MOPAC located in eastern Pennsylvania (collectively, "JBS").

37.    JBS knowingly works with meat by-product recycling, including animal by-products not suitable for human consumption. In fact, it is publicly disclosed that MOPAC has accepted euthanized horses. Exhibit E.[14]

38.    Moreover, JBS has been plagued by investigations, recalls, and other red flag situations that should have alerted Defendant it needs to confirm the safety, quality, and reputation of JBS and the products purchased from JBS for inclusion in the Contaminated Dog Foods.

39.    Indeed, examples of such red flags are:

- June 2009 – In response to an E. coli outbreak that sickened at least 23 people, JBS Swift Beef Company, a Colorado firm, recalled 421,280 pounds of beef products that may have been contaminated with E. coli O157:H7.

- September 2010 – The JBS unit was forced to undertake a third recall, this one for 258,000 pounds of cooked beef products.

- June 2013 – JBS Swift, Tyson Fresh Meat, Beef Products Inc. and several other companies blamed for the 2010 death of a Minnesota man due to E. coli poisoning in a lawsuit filed on January 8, 2013.

- August 2015 – Inhumane treatment in the handling and/or slaughtering of animals was cited in Quarter 2 at three out of four large-volume plants where USDA meat inspectors started administrative actions, either now taken or pending, that often end with short suspensions. The nation's top meat producers—Cargill Meat Solutions, JBS, and Tyson Fresh Meats Inc.—own and operate seven of those large plants, where employment tops 500 and production levels put them among the elite high volume plants.

- April 2017 – Health authorities in Europe, China, and Brazil all temporarily pulled beef from the Brazilian meat giant JBS off of grocery store shelves, in response to evidence that

---

[14] http://www.saveamericashorses.net/slaughter/parender.htm

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

the company was involved in a massive corruption scandal to export rotten and contaminated meat.

- August 2017 – JBS USA, Inc. recalled 4,922 pounds of ground beef products produced at its Lenoir, NC facility because they may be contaminated with extraneous materials, according to the U.S. Department of Agriculture's Food Safety and Inspection Service.

40. Moreover, a Warning Letter to JBS dated April 23, 2019, concluded that JBS "failed to identify and exclude raw materials and ingredients containing pentobarbital" prior to March 2018. That same investigation concluded that tallow samples produced by JBS in 2017 and 2018 tested positive for pentobarbital and a government agency has since determined that JBS continued accepting "dead stock" until July 2018.

41. Yet Defendant chose to utilize JBS as a supplier even though it maintains that it keeps rigorous quality and supplier standards from "start to finish" and performs three-tier auditing that includes third party auditors, to ensure pure ingredients and fair labor are used in its products, including the Contaminated Dog Foods. Given this rigorous auditing process, Defendant knew or recklessly chose to ignore that the Contaminated Dog Foods were adulterated pet food as it retained samples of the tallow that should have been tested based on the claimed practices and standards by Defendant and the public knowledge that JBS has accepted euthanized horses.[15]

42. Defendant also knew the real risk that pentobarbital may appear in the Contaminated Dog Foods if the manufacturing and sourcing of rendered ingredients were not properly monitored. Defendant's products are at risk of pentobarbital contamination due to the use of products containing rendered ingredients, such as animal fat and bone meal, which have repeatedly caused pentobarbital outbreaks over the years. Indeed, this is not the first time that the Gravy Train or Kibbles 'n Bits® lines of food have been determined to include pentobarbital: "Back in 2001, analyses by the FDA found residue of the sedative in popular brands like Nutro, Gravy Train, and Kibbles 'n Bits."[16]

---

[15] http://www.bigheartpet.com/assets/CR-Policy.pdf

[16] https://www.care2.com/causes/fda-says-pet-food-company-cannot-donate-recalled-products-to-shelter.html



43. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

44.     However, Defendant refused to take the adequate steps to prevent pentobarbital

contamination from rendered ingredients. Following the Evanger's recall in February 2017,

Defendant ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

45. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████

46. ████████████████████████████████████████

████████████████████████████████████████████

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████████

3      47. ████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ██████████████████████████████ After yet another recall in 2018 for unrelated

9 problems with Defendant's treats, ████████████████████████████████

10 ██████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ██████

13      48.     Moreover, Defendant's Corporate Responsibility Policy says the top priority is the

14 "safety and quality" of its products: [17]

> **Pet food safety and quality.** *Big Heart Pet Brands top priority is the safety and quality of our products. Our goal is to produce the finest pet food products available on the market today. All of our products are made under a system of strict food safety and quality controls combined with ongoing inspection and monitoring. All of our programs are designed to exceed the Global Food Safety Initiative standards. Our products are made with nutritious, quality ingredients that meet the applicable standards and specifications of the U.S. Department of Agriculture (USDA), Association of American Feed Control Officials (AAFCO) and the Food & Drug Administration (FDA). Each of our products is processed and packaged following strict food safety and quality control procedures that comply with the Good Manufacturing Practices established by the FDA. These procedures ensure that the resulting food will be pure, wholesome and safe for pets.*

21      49.     In this same document, Defendant claims that it has a "rigorous supplier approval

22 process" and only purchases ingredients from "reputable suppliers." And Defendant goes further

23 to declare, that once a supplier is approved, "***a comprehensive testing program is in place to assess***

---

[17] Big Heart Pet Brands, Corporate Responsibility Policy," http://www.bigheartpet.com/assets/CR-Policy.pdf

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1   ***the safety and quality of the ingredients upon receipt. This includes a combination of laboratory***

2   ***analysis and physical inspection of the ingredients.***"[18]

3       50.    Here, Defendant admittedly retained samples of the tallow from JBS. These same

4   samples showed the alarmingly high levels of pentobarbital once tested in response to the

5   independent investigation by WJLA. Thus, Defendant either knowingly included the

6   contaminated tallow as an ingredient in its dog food products or failed to test the tallow for

7   pentobarbital and purposefully ignored the publicly touted testing program it has implemented "to

8   assess the safety of quality of the ingredients" in manufacturing the Contaminated Dog Foods.

9       51.    Finally, Defendant highlights the strict oversight it supposedly applies across all its

10  brands, including Gravy Train and Kibbles 'n Bits®, to ensure high quality products "from start to

11  finish, inside and out:"[19]

12
13  We apply the same expectations of quality that we
    hold for ourselves to our suppliers. Our supplier
    management program includes an extensive evaluation
14  of manufacturing locations and a comprehensive testing
    program that is used to assess the safety and quality
15  of ingredients upon receipt. This program includes
    a combination of laboratory analysis and physical
    inspection.
16
    Through rigorous commitment to the quality of our
17  products—from start to finish, inside and out—Big Heart
    Pet Brands is able to nurture the bond between pets and
18  the people who love them.

19      52.    Following the discovery of pentobarbital in the Contaminated Dog Foods,

20  Defendant's own actions show the misleading representations concerning its supposed rigorous

21  and strict quality control. Specifically, and only after it was notified of the presence of

22  pentobarbital in the Contaminated Dog Foods, Defendant scrambled to verify the animal origins

23  of its raw material suppliers and to confirm their procedures for excluding chemically euthanized

24  animals from the "raw material stream." Further, Defendant only recently started testing "all of

25  _____

26  [18] *Id.*

27  [19] Big Heart Pet Brands, "Corporate Responsibility Summary 2014," http://www.bigheartpet.
    com/assets/CorporateResponsibilitySummaryBrochure2014.pdf

28

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

[its] products for the presence of pentobarbital as a new quality assurance protocol." Defendant acknowledged the lack of proper quality control and oversight by stating: "In addition, we are enhancing our sourcing and supplier oversight procedures to ensure this does not occur again."[20] However, these generic statements about a "new quality assurance protocol" are dubious given Defendant's prior disregard for the risk of pentobarbital and continued use of rendered ingredients.[21]

53. Currently, consumers are in the dark regarding whether Defendant is adequately screening its product for pentobarbital moving forward. While some of the Plaintiffs desire to purchase Defendant's products in the future, they lack the necessary information on Defendant's pentobarbital testing, such as the scheduled frequency of pentobarbital testing on the finished product or rendered ingredients, to know if Defendant's products are no longer at risk for pentobarbital. In addition, Defendant is not under any legal obligation to continue pentobarbital testing and could fail to meet its testing schedule without consequence, leaving consumers once again susceptible to purchasing products adulterated with pentobarbital. Absent a court order enjoining Defendant to test for pentobarbital and to disclose on its label that it tests its products to ensure that they is not adulterated, consumers will have no meaningful way of knowing if Defendant's products are actually free of adulteration from pentobarbital.

54. Finally, a recent development shows that Defendant's promise of "enhancing [its] sourcing and supplier oversight procedures" is not sufficient to ensure the safety of its products. Specifically, Defendant just announced a recall for its cat food on December 5, 2019 due to "health concerns" that mirror those that result from ingestion of pentobarbital. Although the recall notice fails to disclose what ingredient created the health concerns, Defendant does admit that the cat food "does not meet the Company's quality and safety standards."[22]

---

[20] http://www.gravytraindog.com/information

[21] Many of Defendant's Contaminated Dog Foods still contain "steamed bone meal" and "animal fat," according to its current labeling. https://www.kibblesnbits.com/products/wet-varieties

[22] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/j-m-smucker-company-issues-voluntary-recall-specific-lots-special-kittyr-wet-canned-cat-food-due

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

**DEFENDANT NEGLIGENTLY, RECKLESSLY, AND/OR KNOWINGLY MISLEADS CONSUMERS THROUGH ITS REPRESENTATIONS, PACKAGING, LABELS, STATEMENTS, WARRANTIES, AND SELLING OF THE CONTAMINATED DOG FOODS AS UNADULTERATED**

55.     Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells its extensive lines of the Contaminated Dog Food products in California and across the United States.

56.     Defendant negligently, recklessly, and/or knowingly falsely advertises that the Contaminated Dog Foods are healthy and provide complete nutrition and quality while omitting they are adulterated with pentobarbital.

57.     Defendant wrongfully advertised and sold the Contaminated Dog Foods without any label or warning indicating to consumers that these products contained any level of pentobarbital or that Defendant utilized animals that have been euthanized as a protein or meat by-product source.

58.     Defendant also wrongfully advertised and sold the Contaminated Dog Foods as complete nutrition, quality, and healthy despite the presence of pentobarbital.

59.     Instead, the advertising and labels intentionally omit any reference to the food being adulterated:



Gravy Train® Chunks In Gravy With Beef Chunks wet dog food is bursting with the hearty flavor of real beef. And all the meaty goodness is covered in a rich savory gravy to make a hearty meal your dog will love.

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

60.     Defendant claims that the Contaminated Dog Foods are "100 percent complete and balanced nutrition," but fails to mention that the Contaminated Dog Foods are in fact adulterated and contain pentobarbital.[23]

**About this item**

**Disclaimer:** While we aim to provide accurate product information, it is provided by manufacturers, suppliers and others, and has not been verified by us. See our disclaimer.

Serve your four legged friend a deliciously hearty meal with Gravy Train Chunks In Gravy with T-Bone Flavor Chunks Wet Dog Food. Each mouthwatering bite has the flavor of T-Bone steak and all the meaty goodness is covered in a savory gravy that dogs love. This gravy train dog food offers a satisfying meal that provides 100 percent complete and balanced nutrition for all life stages. Feed it to your furry friend as a reward for good behavior or learning a new trick or serve it as a regular meal. Gravy Train Chunks In Gravy with T-Bone Flavor Chunks Wet Dog Food comes in a 13.2 oz can.

61.     Defendant's omissions are material, false, misleading, and reasonably likely to deceive the public.  This is especially true in light of the long-standing campaign by Defendant to market all its products, including the Contaminated Dog Foods as "providing safe, healthy, and high-quality food" with "the purest ingredients."[24]

62.     Defendant's advertising campaign is false, misleading, and/or deceptive by using these descriptions, promises, and representations because there was no label or warning indicating to consumers that these products contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein or meat by-product source.  Defendant's statements, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are healthy, safe, have only pure ingredients and are manufactured under rigorous standards.

63.     Defendant chose to advertise, label, and market its products, including the Contaminated Dog Foods, as pure, high quality, healthy and safe for dogs to ingest without

---

[23] Walmart, Gravy Train T-Bone Flavor Wet Dog Food, https://www.walmart.com/ip/Gravy-Train-T-Bone-Flavor-Wet-Dog-Food-13-2-Oz/44465093#read-more

[24]Big Heart Pet Brands, "Pets," http://www.bigheartpet.com/corporate-responsibility/pets.aspx

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

disclosing that the Contaminated Dog Foods were adulterated and contained pentobarbital. The Contaminated Dog Foods are available at numerous retail and online outlets.

64. In fact, Defendant made affirmative misleading representations that its products, including the Contaminated Dog Foods, were not adulterated or would contain any controlled substance, including pentobarbital. Specifically, Defendant promises to its consumers that all products meet USDA and FDA standards.[25]

65. This is untrue because the Contaminated Dog Foods are adulterated, which is not proper under state and federal laws and regulations. Specifically, under the FDCA, a food is adulterated if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." 21 U.S.C. § 342. Under California law, pet food is considered adulterated if "it bears or contains any poisonous or deleterious substance that may render it injurious to health" or "if damage or inferiority has been concealed in any manner." Cal. Health & Safety Code § 113090(a), (h). California's statute also provides that pet food ingredients "of animal or poultry origin shall be only from animals or poultry slaughtered or processed in an approved or licensed establishment…. Animal or poultry classified as 'deads' are prohibited." Cal. Health & Safety Code § 113035. Other relevant states likewise prohibit the sale of adulterated pet food. Ohio Rev. Code Ann. § 923.41, *et seq.*; Ala. Code § 2-21-23; Fla. Stat. § 500.10; Ga. Code Ann. § 2-13-11; 505 Ill. Comp. Stat. Ann. 30/11.1; N.Y. Agric. & Mkts. Law § 199-A; Tex. Agric. Code Ann. § 141.002, *et seq.*; Tenn. Code Ann. § 44-6-103, *et seq.*; W. Va. Code § 19-14-10, *et seq.*

66. The Contaminated Dog Foods are widely advertised.

67. Defendant's webpage and adopted corporate policies repeatedly make the false, misleading, and/or deceptive statements, described above, about the Contaminated Dog Foods without any mention of pentobarbital or that Defendant utilized euthanized animals as a protein or meat by-product source.

---

[25] http://www.bigheartpet.com/assets/CR-Policy.pdf

68. As a result of Defendant's omissions and misrepresentations, a reasonable consumer would have no reason to suspect the presence of pentobarbital without conducting his or her own scientific tests, or reviewing third-party scientific testing of these products.

69. Consumers have increasingly become more aware and cautious about the nutritional value and ingredients in the pet food they choose to purchase.

70. Additionally, Defendant knew that a consumer would be feeding the Contaminated Dog Foods multiple times each day to his or her dog, leading to repeated exposure of the barbiturate to the dog(s).

71. A reasonable consumer, such as Plaintiffs and other members of the Classes would have no reason to expect and anticipate that the Contaminated Dog Foods are made up of anything other than pure ingredients from reputable suppliers or that quality and safety is not the top priority, as promised by Defendant. Defendant's non-disclosure and concealment of any level of pentobarbital or utilization of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods coupled with partial disclosures and/or misrepresentations that the food is pure, quality, healthy, and safe by Defendant is intended to and does, in fact, cause consumers to purchase a product they would not have bought at all if the true quality and ingredients were disclosed. As a result of these false statements, omissions, and concealment, Defendant has generated substantial sales of the Contaminated Dog Foods.

72. Plaintiffs bring this action individually and on behalf of all other similarly situated consumers within the United States who purchased the Contaminated Dog Foods, in order to cause the disclosure of the inclusion of pentobarbital and/or the utilization of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods, to correct the false and misleading perception Defendant has created in the minds of consumers that the Contaminated Dog Foods are high quality, safe, and healthy, and to obtain redress for those who have purchased the Contaminated Dog Foods.

**CONSUMERS WERE ABLE TO PURCHASE THE RECALLED CONTAMINATED DOG FOODS FOR MONTHS AND A RECENT RECALL SHOWS INADEQUATE QUALITY CONTROL PROCEDURES STILL EXIST**

73. Defendant has represented that "[t]here is nothing more important than ensuring pet parents can continue to feel confident they are making the best decision for their pets when they choose our brand" and that it voluntarily withdrew all dog food products that are subject to the recall.

74. Likewise, the FDA has informed the public that Defendant was "withdrawing all lots of these [the Contaminated Dog Foods] that were manufactured from 2016 through the present."[26]

75. Yet, months after the recall, consumers were still able to purchase the Contaminated Dog Foods from stores and online merchants. Thus, consumers who are unaware of the recall are able to purchase the Contaminated Dog Foods without receiving any notice that the dog food has been recalled or is adulterated at the time of purchase. Moreover, consumers who have relied on the affirmative statements by Defendant that the Contaminated Dog Foods are no longer on the shelves or available to purchase online have been misled into purchasing the Contaminated Dog Foods. Indeed, upon information and belief, consumers were still able to purchase certain lines of the Contaminated Dog Foods up to June 1, 2018, on a Big-Box store's website.

76. Moreover, Defendant's recent announcement that it had to recall cat food due to health concerns created by an ingredient that "does not meet the Company's quality and safety standards" shows its claimed improvements to quality assurance issues are insufficient, including the testing for pentobarbital and "enhancing [its] sourcing and supplier oversight procedures" is not sufficient to ensure the safety of its products"[27]

**JURISDICTION AND VENUE**

77. This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds

---

[26] https://www.fda.gov/animalveterinary/newsevents/ucm597135.htm

[27] https://www.gravytraindog.com/information

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Classes reside in states other than the states in which Defendant is a citizen and in which this case is filed, and none of the exemptions to jurisdiction under 28 U.S.C. § 1332(d) apply.

78. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiffs suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## **INTRADISTRICT ASSIGNMENT**

79. A substantial portion of the transactions and wrongdoings which gave rise to the claims in this action occurred in the County of Marin, and as such, this action is properly assigned to the San Francisco division of this Court.

## **THE PARTIES**

80. Plaintiff Maclain Mullins ("Plaintiff Mullins") is, and at all times relevant hereto has been, a citizen of the State of Kentucky. Plaintiff Mullins purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy and Chunks in Gravy with Beef Chunks) and fed it to his boxer named Cawood. Plaintiff Mullins started purchasing the Contaminated Dog Foods in or around January 2009 approximately ten to twenty times a year and continued to purchase until approximately January 2015. Plaintiff Mullins relied upon "100 percent complete and balanced nutrition," claim when purchasing the Contaminated Dog Foods. Plaintiff Mullins also fed Cawood Gravy Train dry food. Plaintiff Mullins primarily purchased the Contaminated Dog Foods from Hartland Kroger in Lexington, Kentucky. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Mullins was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals.

81. As the result of Defendant's deceptive and negligent conduct as alleged herein, Plaintiff Mullins was injured when he purchased the Contaminated Dog Foods that did not deliver

what it promised and did business with a company he would not have if he knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized animals that have been euthanized as a protein source. He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high-quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Mullins encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

82.80. Plaintiff Thomas Roupe ("Plaintiff Roupe") is, and at all times relevant hereto has been, a citizen of the State of Georgia. Plaintiff Roupe purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks and Gravy Train Chunks in Gravy with Turkey Chunks) and fed the Contaminated Dog Foods to his two-year old dog, Prince. Plaintiff Roupe believed the Gravy Train foods he fed his dog were safe and healthy, and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods.

83.81. Plaintiff Roupe has been purchasing the Contaminated Dog Foods since approximately March 2016, and his last purchase was on approximately February 16, 2018. Plaintiff Roupe relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. Plaintiff Roupe no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital. Plaintiff Roupe primarily purchased the Contaminated Dog Foods from his local Walmart and Piggly Wiggly. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Roupe was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Roupe was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

84.82. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Roupe was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Roupe was further injured as he did business with a company he would not have if he knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Roupe encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

85.83. Plaintiff Neil Sebastiano ("Plaintiff Sebastiano") is, and at all times relevant hereto has been, a citizen of the State of Florida. Plaintiff Sebastiano purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks and Gravy Train Strips in Gravy with Beef Strips) and fed the Contaminated Dog Foods to his dog, Samson, a rottweiler-shepherd mix. Plaintiff Sebastiano trusted Defendant's representations about the safety and quality of its products when he purchased the Contaminated Dog Foods. Plaintiff Sebastiano relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods.

86.84. Beginning in approximately June 2015, Plaintiff Sebastiano generally purchased ten-twelve cans of the Contaminated Dog Foods each month from his local Walmart in Spring Hill, Florida. His last purchase was approximately November 1, 2017. In August 2017, Plaintiff Sebastiano's dog became weak and confused, began vomiting, had blood in his stool, lost weight, no longer wanted to eat, and had trouble standing and walking. At only seven and a half years old, Samson died, on December 4, 2017.

87.85. During the time Plaintiff Sebastiano purchased the Contaminated Dog Foods, and because of the false and misleading claims, warranties, representations, advertisements, and other

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

marketing by Defendant, Plaintiff Sebastiano was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Sebastiano was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value because they were adulterated.

88.86. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Sebastiano was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Sebastiano was further injured as he did business with a company he would not have if he knew the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Sebastiano encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

89.87. Plaintiff Nancy Sturm ("Plaintiff Sturm") is, and at all times relevant hereto has been, a citizen of the State of Illinois. Plaintiff Sturm purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks and Gravy Train Chunks in Gravy with Lamb and Rice Chunks) and fed the Contaminated Dog Foods to her six rescue dogs: Angel, a seventeen-year-old boxer/beagle mix; Penny, a ten-year-old terrier mix; Sugar and Boots, who are six-year-old sisters that are black lab and golden retriever mixes; Dottie, a four-year-old Australian shepherd and bluetick coonhound mix; and Maggie a 9 month old mixed breed puppy. Plaintiff Sturm considers her rescue dogs to be a part of her family and trusted in Defendant when purchasing the Contaminated Dog Foods.

90.88. Plaintiff Sturm has been purchasing the Contaminated Dog Foods for over five years and her last purchase was approximately February 1, 2018. Plaintiff Sturm relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

Foods. Plaintiff Sturm no longer purchases the Contaminated Dog Foods after learning of the inclusion of pentobarbital. Plaintiff Sturm primarily purchased the Contaminated Dog Foods from her local Walmart. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Sturm was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Sturm was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

91.89. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Sturm was injured when she purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Sturm was further injured as she did business with a Company she would not have if she knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized animals that have been euthanized as a protein source. She purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Sturm encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

92.90. Plaintiff Jeremy Wahl ("Plaintiff Wahl") is, and at all times relevant hereto has been, a citizen of the State of California. Plaintiff Wahl purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks and Gravy Train with Chicken Chunks) and fed the Contaminated Dog Foods to his nine-year-old Pomeranian-American Eskimo mix, Buddy. Plaintiff Wahl purchased the Contaminated Dog Foods as supplemental food or as treats for his dog. Plaintiff Wahl believed the Gravy Train foods he fed his dog were safe and healthy, and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods. Plaintiff Wahl relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods.

872279.1

93.91. Plaintiff Wahl has been purchasing the Contaminated Dog Foods since approximately March 2014, and his last purchase was in or around February 2018. Plaintiff Wahl no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital. Typically, Plaintiff Wahl purchased two to four cans of the Contaminated Dog Foods every two weeks. Plaintiff Wahl primarily purchased the Contaminated Dog Foods from his local 99 Cents Only Stores. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Wahl was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Wahl was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

94.92. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Wahl was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Wahl was further injured as he did business with a company he would not have if he knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Wahl encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

95.93. Plaintiff Kathy Williamson ("Plaintiff Williamson") is, and at all times relevant hereto has been, a citizen of the State of Ohio. Plaintiff Williamson purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks and Kibbles 'n Bits Bistro Tender Cuts with Real Beef & Vegetables in Gravy) and fed the Contaminated Dog Foods to her two Great Danes, Nova and Sadie. Sadie passed away on Wednesday, September 7, 2016, and Nova passed away on Sunday, January 22, 2017. Plaintiff Williamson believed the

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

Gravy Train foods she fed her dogs were safe and healthy, and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods.

96.94.  Plaintiff Williamson has been purchasing the Contaminated Dog Foods since approximately August 2016, and her last purchase was in approximately December 2016.  Plaintiff Williamson relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods.  Plaintiff Williamson no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital.  Plaintiff Williamson primarily purchased the Contaminated Dog Foods from her local Walmart.  During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Williamson was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals.  Plaintiff Williamson was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

97.95.  As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Williamson was injured when she purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated.  Plaintiff Williamson was further injured as she did business with a company she would not have if she knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source.   She purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source.  Further, should Plaintiff Williamson encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

98.96.  Plaintiff Norman Todd ("Plaintiff Todd") is, and at all times relevant hereto has been, a citizen of the State of Alabama.  Plaintiff Todd purchased certain lines of the Contaminated

872279.1

Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks) and fed the Contaminated Dog Foods to his American pit bull, Tito. Tito passed away on November 18, 2017. Plaintiff Todd believed the Gravy Train foods he fed his dog were safe and healthy, and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods.

99.97. Plaintiff Todd has been purchasing the Contaminated Dog Foods since approximately 2008, and his last purchase was in approximately September 2017. Plaintiff Todd relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. Plaintiff Todd no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital. Plaintiff Todd primarily purchased the Contaminated Dog Foods from Food Outlet in Millbrook, Alabama. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Todd was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Todd was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

100.98. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Todd was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Todd was further injured as he did business with a company he would not have if he knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Todd encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

101.99.    Plaintiff Betty Christian ("Plaintiff Christian") is, and at all times relevant hereto has been, a citizen of the State of Tennessee.  Plaintiff Christian purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Chicken Chunks) and fed the Contaminated Dog Foods to her dogs, Rusty, a 15 year-old Australian Shepherd, and Smokey, a one-year old Catahoula Leopard-Plot mix.  Plaintiff Christian trusted Defendant's representations about the safety and quality of its products when she purchased the Contaminated Dog Foods.

102.100.    Plaintiff Christian has purchased the Contaminated Dog Foods on a monthly basis for at least 15 years.  Plaintiff Christian relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. She generally purchased the Contaminated Dog Foods from her local Walmart and Food City.  Her last purchase was approximately January 4, 2018.  In February 2018, Smokey became sick and was unable to move, began vomiting, lost control of her bowels, and was bleeding from her rectum.  Plaintiff Christian brought her to the veterinarian, where she stayed for four days before returning home.  After a month-long course of medication, Smokey has recovered.

103.101.    During the time Plaintiff Christian purchased the Contaminated Dog Foods, and because of the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, she was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals.  As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Christian was injured when she purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value because they were adulterated.  Plaintiff Christian was further injured as she did business with a company she would not have if she knew the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source.  She purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

source.  Further, should Plaintiff Christian encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

104.   Plaintiff Aubrey Thomas ("Plaintiff Thomas") is, and at all times relevant hereto has been, a citizen of the state of West Virginia.  Plaintiff Thomas purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Chicken Chunks and Gravy Train Meaty Ground Dinner with Chicken) and fed the Contaminated Dog Foods to his dog, Mia, a one-and-a-half-year-old pit bull-lab mix.  Plaintiff Thomas trusted Defendant's representations about the safety and quality of its products when he purchased the Contaminated Dog Foods.

105.   Beginning in November 2016, Plaintiff Thomas generally purchased twelve cans of the Contaminated Dog Foods a couple of times each month from his local Walmart in Fayetteville, West Virginia.  His last purchase was in February 2018.  Throughout the time that Plaintiff Thomas fed the Contaminated Dog Foods to Mia, she was sick and vomiting several times.

106.   During the time Plaintiff Thomas purchased the Contaminated Dog Foods, and because of the false and misleading claims, warranties, representations, advertisements, other marketing, and a failure to disclose information about the hazards present in the Contaminated Dog Foods by Defendant, he was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals.  As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Thomas was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value because they were adulterated.  Plaintiff Thomas was further injured as he did business with a company he would not have if he knew the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source.  He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy,

872279.1

and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Thomas encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

107. Plaintiff Joyce Brown ("Plaintiff Brown") is, and at all times relevant hereto has been, a citizen of the State of Texas. Plaintiff Brown purchased certain lines of the Contaminated Dog Foods (including Gravy Train Chunks in Gravy with Beef Chunks) and occasionally mixed the wet food with Gravy Train dry food. She rescues stray dogs and has fed all of them the Contaminated Dog Foods. Several of her dogs have died over the course of the class period, including: Speedy, a two-year-old Chihuahua mix who died in December 2016; Humpty, an eight- or nine-year-old lab-chow mix who died in November 2017; Elly Mae, a ten-year-old lab-chow mix who died in December 2017; Sara, an eight-year-old lab who died in October 2017; Red, an eight-year-old lab who died November 2017; Mary, a nine-year-old lab-chow mix who died in August 2017; Duke, a seven-year-old Great Pyrenees who died in August 2017. Plaintiff Brown relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. Plaintiff Brown trusted Defendant's representations about the safety and quality of its products when she purchased the Contaminated Dog Foods.

108. Plaintiff Brown has purchased the Contaminated Dog Foods every two days for the past fifteen years. She generally purchased the Contaminated Dog Foods from her local Kroger, Walmart, and Family Dollar Stores. Her last purchase of the Contaminated Dog Food was in February 2018.

109. During the time Plaintiff Brown purchased the Contaminated Dog Foods, and because of the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, she was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Brown was injured when she purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

or *de minimis* value because they were adulterated. Plaintiff Brown was further injured as she did business with a company she would not have if she knew the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. She purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, healthy, and safe for dogs to ingest and did not include pentobarbital or euthanized animals as a protein source. Further, should Plaintiff Brown encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

110.102.     Plaintiff Roberta Mayo ("Plaintiff Mayo") is, and at all times relevant hereto has been, a citizen of the State of Washington. Plaintiff Mayo purchased the Contaminated Dog Foods (including Gravy Train with Chicken Chunks and Gravy Train with Beef Chunks) and fed the Contaminated Dog Foods to her dogs, including Cocheese (a lab mix), Glory B (a chocolate lab mix), and Blade (an Alaskan husky mix). Most recently, Glory B passed away on or around February 2, 2018, two days after she consumed a can of Gravy Train with Chicken Chunks on or around January 31, 2018. On February 5, 2018, Plaintiff Mayo's cat, Midnight, also passed away after having accidentally ingested some of the Contaminated Dog Food fed to Glory B on January 31st. Plaintiff Mayo believed that the Gravy Train foods she fed her dogs were safe, quality products and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods.

111.103.     Plaintiff Mayo began purchasing the Contaminated Dog Foods on occasion for her dogs in or around February 2015, and her last purchase was on or around January 29, 2018, when she purchased two cans of Gravy Train with Chicken Chunks. Plaintiff Mayo relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. Plaintiff Mayo no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital. Plaintiff Mayo purchased the Contaminated Dog Foods from Safeway in Woodland, Washington; Walmart in Woodland, Washington; and WinCo Foods in Longview,

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

Washington. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Mayo was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Mayo was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

112.104.    As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Mayo was injured when she purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Mayo was further injured as she did business with a company she would not have if she knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. She purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Mayo encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

113.105.    Plaintiff Jack Collins ("Plaintiff Collins") is, and at all times relevant hereto has been, a citizen of the State of Maryland. Plaintiff Collins purchased the Contaminated Dog Foods (including Gravy Train with Beef Chunks; Kibbles 'n Bits Chef's Choice Homestyle Tender Slices with Real Beef, Chicken & Vegetables in Gravy, Kibbles 'n Bits Chef's Choice American Grill Burger Dinner with Real Bacon & Cheese Bits in Gravy, and Kibbles 'n Bits Chef's Choice Bistro Tender Cuts with Real Beef & Vegetables in Gravy) and fed the Contaminated Dog Foods to his miniature poodle, Duffy. Duffy passed away in February 2018, soon after consuming a can of Gravy Train. Plaintiff Collins believed that the Gravy Train and Kibbles 'n Bits dog food he fed his dog were safe, quality products and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods. Plaintiff Collins relied upon the

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

"100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods.

114.106.    Plaintiff Collins began purchasing the Contaminated Dog Foods in or around May 2016, and his last purchase was in or around February 2018.  Plaintiff purchased a case containing twelve cans of the Contaminated Dog Foods approximately every two to three weeks.  Plaintiff Collins no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital.  Plaintiff Collins purchased the Contaminated Dog Foods from Walmart in Waynesboro, Pennsylvania.   During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Collins was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals.  Plaintiff Collins was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

115.107.    As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Collins was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Collins was further injured as he did business with a company he would not have if he knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source.  He purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source.  Further, should Plaintiff Collins encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

116.    Plaintiff Vivian Jilek ("Plaintiff Jilek") is, and at all times relevant hereto has been, a citizen of the state of Minnesota. Plaintiff Jilek purchased certain lines of the Contaminated Dog Foods (including Gravy Train with Beef Chunks, Gravy Train with Chicken Chunks, and Gravy Train Meaty Ground Dinner with Beef and Bacon) and fed the Contaminated Dog Foods to her

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

purebred Yorkshire terrier, Sophie. Plaintiff Jilek believed the Gravy Train foods she fed her dog were safe and healthy, and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods.

117. Plaintiff Jilek has been purchasing the Contaminated Dog Foods since approximately 2013, and her last purchase was in approximately April 2018. Plaintiff Jilek relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. Plaintiff Jilek no longer purchases the Contaminated Dog Foods after learning of the presence of pentobarbital. Plaintiff Jilek primarily purchased the Contaminated Dog Foods from Family Dollar in Faribault, Minnesota and Family Dollar in Owatonna, Minnesota. During that time, based on the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Jilek was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. Plaintiff Jilek was injured by purchasing the Contaminated Dog Foods that had no value or *de minimis* value as they were adulterated.

118. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Jilek was injured when he purchased the Contaminated Dog Foods, which did not deliver what Defendant promised and had no value or *de minimis* value as they were adulterated. Plaintiff Jilek was further injured as she did business with a company she would not have if she knew that the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. She purchased the adulterated Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, high quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Jilek encounter the Contaminated Dog Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

119.108. Plaintiff Rosemarie Schirripa ("Plaintiff Schirripa") is, and at all times relevant hereto has been, a citizen of the state of New York. Plaintiff Schirripa purchased certain

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

lines of the Contaminated Dog Foods (including the variety 12-pack of Kibbles 'N Bits American Grill Burger Dinner with Real Bacon & Cheese Bits in Gravy and Chef's Choice Bistro Tender Cuts with Real Turkey, Bacon & Vegetables in Gravy Variety) and fed the Contaminated Dog Foods to her dog, Otto, a seven-year-old miniature schnauzer. Plaintiff Schirripa believed the Kibbles 'n Bits food she fed her dog were safe and healthy, and trusted in Defendant's representations about the safety of its products when purchasing the Contaminated Dog Foods. Plaintiff Schirripa purchased the Contaminated Dog Food from a Walmart store in Kingston, New York from approximately January 2017 through April 2017. The purchases were approximately once a month. Plaintiff Schirripa began purchasing the Contaminated Dog Foods online from Walmart.com in May 2017 and last purchased them in October 2017. Plaintiff Schirripa relied upon the "100 percent complete and balanced nutrition" claim when purchasing the Contaminated Dog Foods. After learning of the presence of pentobarbital, Plaintiff Schirripa no longer purchases the Contaminated Dog Foods. Plaintiff Schirripa trusted Defendant's representations about the safety and quality of its products when she purchased the Contaminated Dog Foods.

120.109.    During the time Plaintiff Schirripa purchased the Contaminated Dog Foods, and because of the false and misleading claims, warranties, representations, advertisements, and other marketing by Defendant, she was unaware that the Contaminated Dog Foods contained any level of pentobarbital, a substance largely used to euthanize animals. As the result of Defendant's deceptive and negligent conduct alleged herein, Plaintiff Schirripa was injured when she purchased the Contaminated Dog Foods, which did not delivery what Defendant promised and had no value or *de minimis* value because they were adulterated. Plaintiff Schirripa was further injured as she did business with a company she would not have if she knew the Contaminated Dog Foods contained any level of pentobarbital or that Defendant utilized euthanized animals as a protein source. She purchased the Contaminated Dog Foods on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was unadulterated, pure, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff Schirripa encounter the Contaminated Dog Foods in the future, she could not rely on the

truthfulness of the packaging, absent correct changes to the packaging and advertising of the Contaminated Dog Foods.

121.110.    Defendant Big Heart Pet Brands, Inc. is a subsidiary of J.M. Smucker Company, is incorporated in the State of California, and its headquarters are located at One Maritime Plaza, San Francisco, California.   Defendant manufactures, formulates, produces, distributes, labels, markets, advertises, and sells the Contaminated Dog Foods under the Gravy Train dog food brand name throughout the United States. ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████  in the State of California, and its marketing and advertising was disseminated by Defendant and its agents from the State of California and throughout the United States, through advertising and labeling that contained the misrepresentations and omissions alleged herein.   The advertising and labeling for the Contaminated Dog Foods identified San Francisco, California as Defendant's location and was designed to encourage consumers to purchase the Contaminated Dog Foods and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Classes, into purchasing the Contaminated Dog Foods. Until at least May of 2018, Quality Assurance for Defendant was located in Burbank, California.  Defendant owns, manufactures, and distributes the Contaminated Dog Foods, and created and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Dog Foods in the State of California.

122.111.    The Contaminated Dog Foods containing the claim "100 percent complete and balanced nutrition," at a minimum, include:

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

(a)     Gravy Train Chunks in Gravy with Beef Chunks:





SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1

(b)     Gravy Train with Beef Chunks:



(c)     Gravy Train Chunks in Gravy with T-Bone Flavor Chunks:



SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(d)     Gravy Train with T-Bone Flavor Chunks:





SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(e)     Gravy Train Chunks in Gravy with Chicken Chunks:





SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(f)     Gravy Train With Chicken Chunks:



(g)     Gravy Train Strips in Gravy With Beef Strips:



SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1



      (h)     Gravy Train Chunks in Gravy with Lamb and Rice Chunks:





SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(i)     Gravy Train Chunks in Gravy Stew:



(j)     Gravy Train Meaty Ground Dinner with Beef and Bacon



SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1

2          (k)      Gravy Train Meaty Ground Dinner with Chicken

3



20

21

22

23

24

25

26

27

28
SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1          (l)    Gravy Train with Chicken, Beef & Liver Medley:





SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1   (m)   Chef's Choice Bistro Hearty Cuts with Real Beef, Chicken & Vegetables in

2   Gravy:



14   (n)   Chef's Choice Home-style Tender Slices with Real Beef, Chicken &

15   Vegetables in Gravy:



SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(o) Bistro Tender Cuts with Real Beef & Vegetables in Gravy:



(p) Home-style Meatballs & Pasta Dinner with Real Beef in Tomato Sauce:



1

(q)     Bistro Tender Cuts with Real Turkey, Bacon & Vegetables in Gravy



(r)     American Grill Burger Dinner with Real Bacon & Cheese Bits in Gravy:



## DEFENDANT'S STATEMENTS AND OMISSIONS
## VIOLATE RELEVANT STATE AND FEDERAL LAWS

~~123.~~112.        State laws are designed to ensure that a company's claims about its products are truthful and accurate.  Defendant violated the relevant state laws here, including California, by incorrectly, negligently, deceptively, knowingly, and fraudulently claiming that the Contaminated Dog Foods are nourishing, pure, healthy, quality, and safe and offer 100 percent complete and balanced nutrition with the purest ingredients while meeting all relevant federal regulations, when in fact the Contaminated Dog Foods are adulterated and contain a controlled substance that is not nourishing, healthy, quality, or pure and causes the product not to meet the so-called rigorous supplier standards utilized by Defendant.  Indeed, Defendant negligently, recklessly, and/or intentionally chose to omit that the Contaminated Dog Foods were adulterated, contained pentobarbital, and/or that Defendant utilized euthanized animals as a protein source in the Contaminated Dog Foods.

~~124.~~113.        The Contaminated Dog Food violated numerous state laws prohibiting any sale of adulterated or misbranded pet food. Fla. Stat. Ann. § 580.071; Ga. Code Ann. § 2-13-10; 505 Ill. Comp. Stat. Ann. 30/11.1; Ky. Rev. Stat. Ann. § 250.551; Minn. Stat. Ann. § 25.38; N.Y. Agric. & Mkts. Law § 133; Ohio Rev. Code Ann. § 923.51; Tenn. Code Ann. § 44-6-108; Tex. Agric Code Ann. § 141.148; W.Va. Code Ann § 19-14-10; Wash. Rev. code Ann. § 15.53.902.

~~125.~~114.        Defendant had a duty to disclose the potential known risk of pentobarbital in the Contaminated Dog Foods under numerous state and federal law.  Cal. Health & Safety Code § 113075; Cal. Code Regs., tit. 17, § 19025(e); 21 U.S.C. §§ 342, 343; see also Questions & Answers: Contaminants in Pet Food, available at https://tinyurl.com/y2np5nh6 (last accessed Dec. 5, 2019) ("FDA considers pet food containing pentobarbital residues to be adulterated under the Federal Food, Drug, and Cosmetic Act").

~~126.    Defendant's marketing and advertising campaign has been sufficiently lengthy in duration and widespread in dissemination.~~

127. Defendant has engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption and offer 100 percent complete and balanced nutrition with the purest ingredients.

**PLAINTIFFS' RELIANCE WAS
REASONABLE AND FORESEEN BY DEFENDANT**

128.115. Plaintiffs reasonably relied on Defendant's own false statements, misrepresentations, and omissions concerning the particular qualities and benefits of the Contaminated Dog Foods.

129.116. Plaintiffs read and relied upon the labels of the Contaminated Dog Foods in making their purchasing decisions.

130.117. A reasonable consumer would consider the labeling of a product when deciding whether to purchase the product. Here, Plaintiffs relied on the specific false statements and misrepresentations by Defendant that the Contaminated Dog Foods contain "100 percent complete and balanced nutrition," with no disclosure that the Contaminated Dog Foods were adulterated or contained pentobarbital, a substance largely used to euthanize animals.

**DEFENDANT'S KNOWLEDGE AND NOTICE OF BREACHES
OF ITS EXPRESS AND IMPLIED WARRANTIES**

131.118. Defendant has received sufficient notice of its breaches of express and implied warranties. Defendant has, and had, exclusive knowledge of the physical and chemical make-up of the Contaminated Dog Foods.

132.119. Defendant also had notice of the real risk that pentobarbital may appear in the Contaminated Dog Foods if the manufacturing and sourcing were not properly monitored. Indeed, this is not the first time that Defendant's Gravy Train or Kibbles 'n Bits® lines of food have been found to contain pentobarbital.[28]

---

[28]   https://www.care2.com/causes/fda-says-pet-food-company-cannot-donate-recalled-products-to-shelter.html

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

## PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASSES

~~133.~~120.     Defendant knew that consumers such as Plaintiffs and the proposed Classes would be the end purchasers of the Contaminated Dog Foods and the targets of its advertising and statements.

~~134.~~121.     Defendant intended that the advertising, labeling, statements, and representations would be considered throughout the United States by end purchasers of the Contaminated Dog Foods, including Plaintiffs and the proposed Classes.

~~135.~~122.     Defendant directed the advertising, labeling, statements, representations, and warranties of the Contaminated Dog Foods from the State of California to end purchasers throughout the United States, including Plaintiffs and the proposed Classes.

~~136.~~123.     Defendant directly marketed, from the State of California, to Plaintiffs and the proposed Classes through statements on its website, labeling, advertising, and packaging throughout the United States.

~~137.~~124.     Plaintiffs and the proposed Classes are the intended beneficiaries of the expressed and implied warranties.

## CLASS ACTION ALLEGATIONS

~~138.~~125.     Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure for the California statutory claims:

> All persons who are citizens of Plaintiffs' States who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Class").[29]

~~139.~~126.     Plaintiffs also bring this action individually and on behalf of the following Subclasses pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of California who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for

---

[29] "Plaintiffs' States" include: California, Ohio, Alabama, Georgia, Florida, Illinois, Tennessee, ~~Texas,~~ Washington, Maryland~~, Minnesota, West Virginia,~~ and New York.

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

household or business use, and not for resale (the "California Subclass").

All persons who are citizens of Ohio who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Ohio Subclass").

All persons who are citizens of Alabama who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Alabama Subclass").

All persons who are citizens of Georgia who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Georgia Subclass").

All persons who are citizens of Florida who, from February 1, 2012, to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Florida Subclass").

All persons who are citizens of Illinois who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Illinois Subclass").

All persons who are citizens of Tennessee who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Tennessee Subclass").

All persons who are citizens of Texas who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Texas Subclass").

All persons who are citizens of Washington who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Washington Subclass").

All persons who are citizens of Maryland who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Maryland Subclass").

All persons who are citizens of Minnesota who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

household or business use, and not for resale (the "Minnesota Subclass").

All persons who are citizens of West Virginia who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "West Virginia Subclass").

All persons who are citizens of New York who, from February 1, 2012 to the present, purchased the Contaminated Dog Foods for household or business use, and not for resale (the "New York Subclass").

140.127.  Excluded from the Subclasses (collectively "Classes") are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, and/or employees; co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

141.128.  This action is brought and may be properly maintained as a Class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

142.129.  The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and Court.

143.130.  Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)     whether Defendant owed a duty of care to the Classes;

(b)     whether Defendant knew or should have known that the Contaminated Dog Foods were adulterated or contained pentobarbital;

(c)     whether Defendant wrongfully represented and continues to represent that the Contaminated Dog Foods are healthy, quality, pure, and safe;

(d)     whether Defendant wrongfully represented, and continues to represent, that the Contaminated Dog Foods are manufactured in compliance with all governing regulations;

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(e)     whether Defendant wrongfully failed to state that the Contaminated Dog Foods are in fact adulterated under federal and relevant state laws;

(f)     whether Defendant's representations and omissions in advertising and/or labeling are false, deceptive, and misleading;

(g)     whether those representations and omissions are likely to deceive a reasonable consumer;

(h)     whether Defendant had knowledge that those representations and omissions were false, deceptive, and misleading;

(i)     whether Defendant continues to disseminate those representations and omissions despite knowledge that the representations are false, deceptive, and misleading;

(j)     whether a representation that a product is healthy, pure, quality and nutritious coupled with omissions that the Contaminated Dog Foods were adulterated or contained pentobarbital is material to a reasonable consumer;

(k)     whether Defendant violated sections 17200, *et seq.* of the California Business & Professions Code;

(l)     whether Defendant violated sections 17500, *et seq.* of the California Business & Professions Code;

(m)     whether Defendant violated sections 1750, *et seq.* of the California Civil Code;

(n)     whether Defendant's fraudulently concealed from the Classes that the Contaminated Dog Foods were adulterated;

(o)     whether Defendant breached its express and implied warranties;

(p)     whether Defendant's conduct was negligent per se under applicable law;

(q)     whether Defendant's conduct violated applicable state laws;

(r)     whether Defendant knowingly and/or recklessly utilized JBS as a supplier for ingredients for the Contaminated Dog Foods;

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

(s)     whether Plaintiffs and the members of the Classes are entitled to actual, statutory, and punitive damages; and

(t)     whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

~~144.~~133.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes.  Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

~~145.~~132.     Plaintiffs' claims are typical of each Class and Subclass members' claims in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

~~146.~~133.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes, has no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

~~147.~~134.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class and Subclass member is small such that, absent representative litigation, it would be infeasible for members of the Class and Subclass to redress the wrongs done to them individually.

~~148.~~135.     Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Class and Subclasses.

~~149.~~136.     As a result of the foregoing, Class treatment is appropriate.

**COUNT I**

**(Violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*, Against Defendant on Behalf of the Classes By All Plaintiffs On All Theories Except Plaintiff Mayo Who Proceeds On Grounds Other Than Affirmative Misrepresentation)**

~~150.~~137.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

151.138.    Plaintiffs and each proposed Class member are a "consumer," as that term is defined in section 1761(d) of the California Civil Code.

152.139.    The Contaminated Dog Foods are "goods," as that term is defined in section 1761(a) of the California Civil Code.

153.140.    Defendant is a "person" as that term is defined in section 1761(c) of the California Civil Code.

154.141.    Plaintiffs and each proposed Class member's purchase of Defendant's products constituted a "transaction," as that term is defined in section 1761(e) of the California Civil Code

155.142.    Defendant's conduct alleged herein violates the following provisions of California's Consumers Legal Remedies Act (the "CLRA"):

(a)    California Civil Code section 1770(a)(5), by representing that the Contaminated Dog Foods are pure, quality, healthy and safe for consumption and by failing to disclose that the Contaminated Dog Foods were in fact adulterated with pentobarbital

(b)    California Civil Code section 1770(a)(7), by representing that the Contaminated Dog Foods were of a particular standard, quality, or grade, when they were in fact adulterated and not fit for consumption;

(c)    California Civil Code section 1770(a)(9), by advertising the Contaminated Dog Foods with the intent not to sell them as advertised; and

(d)    California Civil Code section 1770(a)(16), by representing that the Contaminated Dog Foods have been supplied in accordance with previous representations when they have not.

156.143.    As a direct and proximate result of these violations, Plaintiffs and the Classes have been harmed, and that harm will continue unless Defendant is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Contaminated Dog Foods.

1    157.144.    On February 14, 2018, February 22, 2018, March 14, 2018, March 21, 2018,

2    May 9, 2018, June 19, 2018, and October 10, 2019, counsel for Plaintiffs and the Class sent

3    Defendant written notices (via U.S. certified mail, return receipt requested) that its conduct is in

4    violation of the CLRA concerning the aforementioned representations and pentobarbital.

5    158.145.    Defendant failed to provide appropriate relief for its violations of CLRA

6    sections 1770(a)(5), (7), (9), and (16) within thirty days of receipt of Plaintiffs' notifications.    In

7    accordance with CLRA section 1782(b), Plaintiffs and the Class are entitled, under CLRA section

8    1780, to recover and obtain the following relief for Defendant's violations of CLRA sections

9    1770(a)(5),(7), (9) and (16):

10            (a)    actual damages under CLRA section 1780(a)(1);

11            (b)    restitution of property under CLRA section 1780(a)(3);

12            (c)    punitive damages under CLRA section 1780(a)(4) and because Defendant

13    has engaged in fraud, malice, or oppression; and

14            (d)    any other relief the Court deems proper under CLRA section 1780(a)(5).

15    159.146.    Plaintiffs seek an award of attorneys' fees pursuant to, inter alia, section

16    1780(e) of the California Civil Code and section 1021.5 of the California Code of Civil Procedure.

## COUNT II

**(Violations of California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500,
*et seq.*, Against Defendant on Behalf of the Classes By All Plaintiffs On All Theories
Except Plaintiff Mayo Who Proceeds On Grounds Other Than Affirmative
Misrepresentation for Injunctive Relief)**

21    160.147.    Plaintiffs incorporate by reference and reallege each and every allegation

22    contained above, as though fully set forth herein.

23    161.148.    California's False Advertising Law ("FAL") prohibits any statement in

24    connection with the sale of goods "which is untrue or misleading."  Cal. Bus. & Prof. Code §

25    17500.

26    162.149.    As set forth herein, Defendant's claims that the Contaminated Dog Foods

27    are healthy and safe for consumption are literally false and likely to deceive the public.

28

1    ~~163.~~150.    Defendant's claims that the Contaminated Dog Foods are pure, quality,

2    healthy, and safe for consumption are untrue or misleading because these claims fail to disclose

3    that the Contaminated Dog Foods were in fact adulterated by containing the controlled substance

4    of pentobarbital.

5    ~~164.~~151.    Defendant's claim that the Contaminated Dog Foods provide 100 percent

6    complete and balanced nutrition are untrue or misleading because Defendant fails to disclose that

7    the Contaminated Dog Foods were in fact adulterated with pentobarbital.

8    ~~165.~~152.    Defendant knew, or reasonably should have known, that the claims were

9    untrue or misleading.

10    ~~166.~~153.    Defendant's conduct is ongoing and continuing, such that prospective

11    injunctive relief is necessary, especially given Plaintiffs' desire to purchase these products in the

12    future if they can be assured that the Contaminated Dog Foods are properly unadulterated pet food

13    and meet the advertising claims.

14    ~~167.~~154.    Plaintiffs and members of the Classes are entitled to injunctive ~~and equitable~~

15    relief~~, and restitution in the amount they spent on the Contaminated Dog Foods~~.

16    ## COUNT III

17    **(Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200,
18    *et seq.*, Against Defendant on Behalf of the Classes By All Plaintiffs On All Theories
     Except Plaintiff Mayo Who Proceeds On Grounds Other Than Affirmative
19    Misrepresentation for Injunctive Relief)**

20    ~~168.~~155.    Plaintiffs incorporate by reference and reallege each and every allegation

21    contained above, as though fully set forth herein.

22    ~~169.~~156.    The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent

23    business act or practice." Cal. Bus. & Prof. Code § 17200.

24    **Fraudulent**

25    ~~170.~~157.    Defendant's statements that the Contaminated Dog Foods are pure, quality

26    healthy, and safe and provide 100 percent complete and balance nutrition are literally false and

27

28
                                   - 57 -          Lead Case No. 4:18-cv-00861-JSW

872279.1

likely to deceive the public, as is Defendant's failing to make any mention that the Contaminated Dog Foods are adulterated and contain pentobarbital.

**Unlawful**

171.158. As alleged herein, Defendant has sold and advertised the adulterated Contaminated Dog Foods with false or misleading claims, such that Defendant's actions as alleged herein violate at least the following laws:

- the CLRA, Cal. Civ. Code §§ 1750, *et seq*.; and
- the FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

**Unfair**

172.159. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Contaminated Dog Foods is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

173.160. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Contaminated Dog Foods is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the FAL and the CLRA.

174.161. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Contaminated Dog Foods is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one consumers, themselves, can reasonably avoid.

175.162. In accordance with section 17203 of the California Business & Professions Code, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

~~176.   On behalf of himself and the Classes, Plaintiffs also seek an order for the restitution of all monies from the sale the Contaminated Dog Foods, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition consistent with Cal. Com. Code § 2721.~~

**COUNT IV**

**(Breach of Express Warranty, Cal. Com. Code § 2313,
Against Defendant on Behalf of the Classes)**

~~177.~~163.      Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

~~178.~~164.      As set forth herein, Defendant made express representations to Plaintiffs and the Classes that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption and provide 100 percent complete and balanced nutrition.

~~179.~~165.      Defendant also made express representations to Plaintiffs and the Classes that the Contaminated Dog Foods comply with all applicable regulations, including that they are not adulterated by allowing their sale in various stores throughout the United States.

~~180.~~166.      These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

~~181.~~167.      There was a sale of goods from Defendant to Plaintiffs and the Class members.

~~182.~~168.      On the basis of these express warranties, Defendant sold the Contaminated Dog Foods to Plaintiffs and the Classes.

~~183.~~169.      Defendant knowingly breached the express warranties by selling the Contaminated Dog Foods which are adulterated and contain pentobarbital.

~~184.~~170.      Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as protein or meat by-product source in the Contaminated Dog Foods.

~~185.~~171.      Privity exists because Defendant expressly warranted to Plaintiffs and the Classes that the Contaminated Dog Foods were unadulterated, pure, quality, healthy, and safe for consumption and provided 100 percent complete and balanced nutrition.

1   186.172.    Plaintiffs and the Classes reasonably relied on the express warranties by

2   Defendant.

3   187.173.    As a result of Defendant's breaches of its express warranties, Plaintiffs and

4   the Classes sustained damages when they paid money for the Contaminated Dog Foods that were

5   not what Defendant represented and were not properly sold under applicable regulations and law.

6   188.174.    Plaintiffs on behalf of themselves and the Classes, seek actual damages for

7   Defendant's breach of warranty.

8                           .COUNT V

9          (Fraudulent Concealment Against Defendant on Behalf of the Classes)

10  189.    Plaintiffs incorporate by reference and reallege each and every allegation contained above,

11  as though fully set forth herein.

12  190.    As alleged more fully herein, at the time Defendant sold the Contaminated Dog Foods to

13  Plaintiffs and Class Members, it knew it was adulterated with pentobarbital.

14  191.    At all times relevant herein, Defendant made misrepresentations of material fact to

15  Plaintiffs and the other Class Members as a means of concealing the true nature and quality of the

16  Contaminated Dog Foods, claiming it was pure, nutritious, healthy, and pure quality with no

17  disclosure that the Contaminated Dog Foods were adulterated and pentobarbital.

18  192.    Defendant has concealed material facts from Plaintiffs and the other Class Members,

19  including but not limited to:

20  (a)     the true nature and quality of the Contaminated Dog Foods;

21  (b)     the inclusion of pentobarbital in the Contaminated Dog Foods; and

22  (c)     that the Contaminated Dog Foods were not lawfully sold as labelled and packaged as they

23  were adulterated.

24  193.    Defendant had a duty to disclose these facts, regardless of the existence of privity, by virtue

25  of (a) Defendant's exclusive knowledge as to the true nature and ingredients of the Contaminated

26  Dog Foods; (b) Defendant's awareness that Plaintiffs and members of the proposed Classes were

27  not reasonably likely to discover these facts; (c) Defendant's active concealment of those facts

28
                                    - 60 -        Lead Case No. 4:18-cv-00861-JSW

872279.1

from Plaintiffs and the proposed Classes (by, among other things, making the false representations described above); and (d) Defendant's statutory and common-law obligations to disclose material information to the consumers as alleged herein.

194.    Plaintiffs and members of the Classes would have acted differently had Defendant disclosed this information to them and allowed them to make a fully-informed decision before they purchased the Contaminated Dog Foods.

195.    The facts Defendant concealed from Plaintiffs and the Classes are material and uniform in nature.

196.    Defendant made misrepresentations of material fact in an effort to conceal the actual nutritional value, true nature and ingredients of the Contaminated Dog Foods and to prevent Class Members from becoming aware of the nutritional value, true nature, and ingredients of the Contaminated Dog Foods.  Plaintiffs and the Classes would have relied on the disclosure of inclusion of pentobarbital in the Contaminated Dog Foods.

197.    As a proximate result of Defendant's concealment and suppression of material facts, Plaintiffs and the Classes have sustained damage by, among other things, paying for Contaminated Dog Foods that were adulterated and unlawfully sold to consumers, rendering the Contaminated Dog Foods of zero or *de minimis* value.

198.    Plaintiffs, on behalf of themselves and the Classes, seek full refund and/or actual damages for Defendant's fraudulent concealment.

199.    Because Defendant engaged in the conduct alleged herein deliberately and with intent, Plaintiffs and the Classes are entitled to an award of punitive damages, the total amount of which shall be proven at trial.

## COUNT VI

**(Violations of Georgia's False Advertising Law, Ga. Code Ann. § 10-1-420 *et seq.*, Against Defendant on Behalf of the Georgia Subclass)**

200. 175.    Plaintiff Roupe incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 61 -        Lead Case No. 4:18-cv-00861-JSW

201.176.    Georgia's False Advertising Law prohibits the sale of merchandise advertised "with intent, design or purpose not to sell … upon the terms stated therein or otherwise communicated …."  Ga. Code Ann. § 10-1-420(a).

202.177.    Georgia's False Advertising Law also prohibits advertising that is "untrue or fraudulent and which is known or which by the exercise or reasonable case should be known to be untrue or fraudulent." Ga. Code Ann. § 10-1-421(a).

203.178.    As set forth herein, Defendant's claims that the Contaminated Dog Foods are healthy and safe for consumption are literally false and likely to deceive the public.

204.179.    Defendant's claims that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption are untrue or misleading because these claims fail to disclose that the Contaminated Dog Foods were in fact adulterated with pentobarbital.

205.180.    Defendant's claim that the Contaminated Dog Foods are 100 percent complete and balanced nutrition are untrue or misleading because it fails to disclose that the Contaminated Dog Foods were in fact adulterated with pentobarbital.

206.181.    Defendant knew, or reasonably should have known, that the claims were untrue or misleading.

207.182.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Roupe's desire to purchase these products in the future if she can be assured that the Contaminated Dog Foods are unadulterated dog food that meets the advertising claims.

208.183.    Plaintiff Roupe and members of the Georgia Subclass are entitled to injunctive and equitable relief pursuant to section 10-1-423 of the Georgia Code.

## COUNT VII

**(Violations of Florida Deceptive and Unfair Trade Practices Act, Fl. Stat. §§ 501.201-501.23, Against Defendant on Behalf of the Florida Subclass)**

209.184.    Plaintiff Sebastiano incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

210.185.    This is an action for relief under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fl. Stat. §§ 501.201-501.23.

211.186.    The purpose of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

212.187.    Plaintiff Sebastiano and each proposed member of the Florida Subclass are "consumers," as defined by section 501.203(7) of the Florida Statutes.

213.188.    Section 501.203(8) of the Florida Statutes defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated.  'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."  Fl. Stat. § 501.203(8).  The advertising, soliciting, providing, offering, or distribution of the Contaminated Dog Foods to Plaintiff Sebastiano and the Florida Subclass is "trade or commerce" within the meaning of section 501.203(8) of the Florida Statutes.

214.189.    Section 501.204(1) of the Florida Statutes provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fl. Stat. § 501.204(1).

215.190.    Defendant engaged in unfair competition and unfair, unlawful, or fraudulent business practices by claiming the Contaminated Dog Foods were pure, quality, healthy, and safe for consumption and by knowingly, intentionally, and/or negligently concealing from Plaintiff Sebastiano and the Florida Subclass the fact that the Contaminated Dog Foods were adulterated with pentobarbital, which was not readily discoverable.  Defendant should have disclosed such information because it was in a superior position to know the facts regarding the true make-up and quality of the Contaminated Dog Foods.  Plaintiff Sebastiano and the Florida Subclass could not

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

reasonably be expected to learn or discover the true facts regarding the make-up and/or quality of the Contaminated Dog Foods.

216.191.    The Defendant's unconscionable, illegal, unfair, and deceptive acts and practices violate the provisions of the FDUTPA.

217.192.    As a direct and proximate result of Defendant's acts and omissions, Plaintiff Sebastiano and the Florida Subclass have suffered or will suffer damages for which they are entitled to relief pursuant to section 501.211(2) of the Florida Statutes and which include, without limitation, a full refund for the Contaminated Dog Foods they purchased, all of which constitute cognizable damages under sections 501.201, *et seq.* of the FDITPA.

218.193.    Plaintiff Sebastiano and the Florida Subclass are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105 of the Florida Statutes upon prevailing in this matter.

**COUNT VIII**

**(Breach of Express Warranty, Fla. Stat. § 672.313,
Against Defendant on Behalf of the Florida Subclass)**

219.    Plaintiff Sebastiano incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

220.    As set forth herein, Defendant made express representations to Plaintiff Sebastiano and the Florida Subclass that the Contaminated Dog Foods are pure, quality, healthy, safe for consumption, and provide 100 percent complete and balanced nutrition.

221.    Defendant also made express representations to Plaintiff Sebastiano and the Florida Subclass that the Contaminated Dog Foods meet all applicable regulations, including that they are not adulterated dog food, by allowing their sale in various stores throughout the United States.

222.    These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

223.    There was a sale of goods from Defendant to Plaintiff Sebastiano and the Florida Subclass members.

872279.1

224.   On the basis of these express warranties, Defendant sold the Contaminated Dog Foods to Plaintiff Sebastiano and the Florida Subclass.

225.   Defendant knowingly breached the express warranties by selling Contaminated Dog Foods that were adulterated and contained pentobarbital.

226.   Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a source of protein or meat by-product in the Contaminated Dog Foods.

227.   Privity exists because Defendant expressly warranted to Plaintiff Sebastiano and the Florida Subclass that the Contaminated Dog Foods were pure, quality, healthy, safe for consumption, unadulterated, and provided 100 percent complete and balanced nutrition.

228.   Plaintiff Sebastiano and the Florida Subclass reasonably relied on the express warranties by Defendant.

229.   As a result of Defendant's breaches of its express warranties, Plaintiff Sebastiano and the Florida Subclass sustained damages as they paid money for Contaminated Dog Foods that were not what Defendant represented and were sold in violation of applicable regulations and laws.

230.   Plaintiff Sebastiano, on behalf of himself and the Florida Subclass, seeks actual damages for Defendant's breach of warranty.

## COUNT VIIIX

**(Breach of Implied Warranty, Fla. Stat. § 672.314,
Against Defendant on Behalf of the Florida Subclass)**

231.194.   Plaintiff Sebastiano incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

232.195.   As set forth herein, the Contaminated Dog Foods are not fit for their ordinary purposes for which they are used as they were adulterated or similarly contaminated.

233.196.   The Contaminated Dog Foods also do not conform to the promises or affirmations of fact made on the packaging or labels.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

234.197.    Defendant is a merchant engaging in the sale of goods to Plaintiff Sebastiano and the Florida Subclass.

235.198.    There was a sale of goods from Defendant to Plaintiff Sebastiano and the Florida Subclass members.

236.199.    Defendant breached the implied warranties by selling the Contaminated Dog Foods that were not fit for their ordinary purpose because they were adulterated dog food that contained pentobarbital.

237.200.    Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a source of protein or meat by-product in the Contaminated Dog Foods.

238.201.    Privity exists because Defendant impliedly warranted to Plaintiff Sebastiano and the Florida Subclass that the Contaminated Dog Foods were unadulterated and fit for their ordinary purpose.

239.202.    As a result of Defendant's breach of its implied warranties of merchantability, Plaintiff Sebastiano and the Florida Subclass sustained damages as they paid money for the Contaminated Dog Foods that were not as Defendant represented.

240.203.    Plaintiff Sebastiano, on behalf of himself and the Florida Subclass, seeks actual damages for Defendant's breach of warranty.

## COUNT VIIIX

**(Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.,* Against Defendant on Behalf of the Illinois Subclass)**

241.204.    Plaintiff Sturm incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242.205.    The conduct described in this Complaint constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* (hereinafter, "ICFA").

872279.1

243.206. Defendant engaged in unfair or deceptive practices in violation of ICFA when it claimed that the Contaminated Dog Foods were pure, quality, healthy, and safe for consumption. These claims are untrue or misleading because they fail to disclose that the Contaminated Dog Foods were in fact adulterated by the controlled substance of pentobarbital and instead claimed that the Contaminated Dog Foods provide 100 percent complete and balanced nutrition.

244.207. Defendant either knew or should have known its Contaminated Dog Foods were adulterated and were not as warranted and represented on the labeling, packaging, advertising, statements, and public sales of the Contaminated Dog Foods.

245.208. Defendant's conduct and omissions described herein repeatedly occurred in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

246.209. The facts concealed or not disclosed by Defendant are material facts in that Plaintiff Sturm and any reasonable consumer would have considered those facts important in deciding whether to purchase the Contaminated Dog Foods. Had Plaintiff Sturm and the Illinois Subclass known that the Contaminated Dog Foods were in fact adulterated by containing the controlled substance of pentobarbital they would not have purchased the Contaminated Dog Foods.

247.210. Defendant intended that Plaintiff Sturm and the Illinois Subclass would rely on the deception in purchasing the Contaminated Dog Foods, unaware of the undisclosed material facts. Defendant knew that Plaintiff Sturm and the Illinois Subclass would rely on its packaging, labels, advertisements, statements, and other public sales of the Contaminated Dog Foods as an unadulterated. This conduct constitutes consumer fraud within the meaning of the various consumer protection statutes.

248.211. Defendant's unlawful conduct is continuing.

249.212. As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendant set forth above, Plaintiff Sturm and Illinois Subclass

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

members are entitled to actual damages, compensatory damages, penalties, a full refund, attorneys' fees and costs as set forth in section 10a of the ICFA.

~~250.~~213.     Defendant's deceptive, misleading, unfair and unconscionable practices set forth above were done willfully, wantonly, and maliciously, entitling Plaintiff Sturm and Illinois Subclass members to an award of punitive damages.

## COUNT IX~~I~~

**(Breach of Express Warranty, Ohio Rev. Code Ann. § 1302.26,**
**Against Defendant on Behalf of the Ohio Subclass)**

~~251.~~214.     Plaintiff Williamson incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

~~252.~~215.     As set forth herein, Defendant made express representations to Plaintiff Williamson and the Ohio Subclass that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption and provide 100 percent complete and balanced nutrition.  Defendant intended these express representations to benefit Plaintiff Williamson and the Ohio Subclass, as purchasers of the Contaminated Dog Foods.

~~253.~~216.     Defendant also made express representations to Plaintiff Williamson and the Ohio Subclass that the Contaminated Dog Foods meet all applicable regulations, including that they are not adulterated dog food by allowing their sale in various stores throughout the United States.

~~254.~~217.     These promises became part of the basis of the bargain between the parties and, thus, constituted express warranties.

~~255.~~218.     There was a sale of goods from Defendant to Plaintiff Williamson and the Ohio Subclass members.

~~256.~~219.     On the basis of these express warranties, Defendant sold to Plaintiff Williamson and the Ohio Subclass the Contaminated Dog Foods.

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

257.220. Defendant knowingly breached the express warranties by selling the Contaminated Dog Foods which are defective because they are adulterated and contain pentobarbital.

258.221. Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods.

259.222. Privity exists because Defendant expressly warranted to Plaintiff Williamson and the Ohio Subclass that the Contaminated Dog Foods were pure, quality, healthy, and safe for consumption and provided 100 percent complete and balanced nutrition and unadulterated.

260.223. Plaintiff Williamson and the Ohio Subclass reasonably relied on the express warranties by Defendant.

261.224. As a result of Defendant's breaches of its express warranties, Plaintiff Williamson and the Ohio Subclass sustained damages as they paid money for the Contaminated Dog Foods that were not what Defendant represented and in fact not properly sold under applicable regulations and law.

262.225. Plaintiff Williamson, on behalf of herself and the Ohio Subclass, seeks actual damages for Defendant's breach of warranty.

**COUNT XII**

**(Breach of Implied Warranty Against Defendant on Behalf of the Ohio Subclass)**

263. Plaintiff Williamson incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

264. As set forth herein, the Contaminated Dog Foods are not fit for the ordinary purposes as they were adulterated or similarly contaminated under section 923.48 of the Ohio Statute (prohibiting pet food that contains any "poisonous or deleterious substance"), as alleged herein. Ohio Rev. Code Ann. § 923.48(A).

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

1    265.   The Contaminated Dog Foods were adulterated at the time Defendant sold the

2    products to Plaintiff Williamson and the Ohio Subclass.

3    266.   Defendant breached the implied warranties by selling the Contaminated Dog Foods

4    that were not fit for their ordinary purpose as adulterated dog food containing pentobarbital.

5    267.   Defendant was on notice of this breach as it was aware of the presence of

6    pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the

7    Contaminated Dog Foods.

8    268.   Defendant controlled all aspects of the design, ingredient selection, manufacture,

9    marketing, and distribution of the Contaminated Dog Foods, including how it was displayed in

10   retail stores, so the distributors and retailers were merely agents of Defendant.  The distributors

11   and retailers have no rights under the warranties at issue and were not intended as the ultimate

12   consumers of the Contaminated Dog Foods.

13   269.   The warranties were designed for and intended to benefit the ultimate purchasers

14   of the Contaminated Dog Foods.  Plaintiffs were the intended third-party beneficiaries of the

15   express and implied warrantied and are in privity of contract with Defendant.

16   270.   Defendant impliedly warranted to Plaintiff Williamson and the Ohio Subclass that

17   the Contaminated Dog Foods were unadulterated and fit for their ordinary purpose

18   271.   As a result of Defendant's breach of its implied warranties of merchantability,

19   Plaintiff Williamson and the Ohio Subclass sustained damages as they paid money for the

20   Contaminated Dog Foods that were not what Defendant represented.

21   272.   Plaintiff Williamson, on behalf of herself and the Ohio Subclass, seeks actual

22   damages for Defendant's breach of warranty.

23   **COUNT XIII**

24   **(Breach of Express Warranty, Tenn. Code Ann. § 47-2-313, Against Defendant
     on Behalf of the Tennessee Subclass)**

25

26   273.226.   Plaintiff Christian incorporates by reference and realleges each and every

27   allegation contained above, as though fully set forth herein.

28
                                          - 70 -        Lead Case No. 4:18-cv-00861-JSW
                                    SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
     872279.1

274.227. As set forth herein, Defendant made express representations to Plaintiff Christian and the Tennessee Subclass that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption, made of wholesome ingredients, and are 100 percent complete and balanced nutrition.

275.228. Defendant also made express representations to Plaintiff Christian and the Tennessee Subclass that the Contaminated Dog Foods meet all applicable regulations, including that they are not adulterated dog food, by allowing their sale in various stores throughout the United States.

276.229. These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

277.230. There were sales of goods from Defendant to Plaintiff Christian and the Tennessee Subclass.

278.231. On the basis of these express warranties, Plaintiff Christian and the members of the Tennessee Subclass purchased the Contaminated Dog Foods from Defendant.

279.232. Defendant's representations and warranties were made in connection with the sale of the Contaminated Dog Foods to Plaintiff Christian and the members of the Tennessee Subclass, who relied on Defendant's representations and warranties regarding the Contaminated Dog Foods when deciding whether to purchase the Defendant's products.

280.233. Defendant knowingly breached the express warranties by selling the Contaminated Dog Foods to Plaintiff Christian and the Tennessee Subclass, which are adulterated and contain pentobarbital.

281.234. The Contaminated Dog Foods did not conform to Defendant's representations and affirmations because they are not suitable for consumption by canines and contain pentobarbital.

282.235. Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods.

283.236.     As the direct and proximate result of Defendant's conduct, Plaintiff Christian and the members of the Tennessee Subclass suffered actual damages in that they purchased Contaminated Dog Foods that were not what Defendant represented and that they would not have purchased at all had they known of the presence of pentobarbital.

284.237.     Plaintiff Christian, on behalf of herself and the Tennessee Subclass, seeks full refund and/or actual damages for Defendant's breach of warranty.

## COUNT XIV

**(Fraud Against Defendant on Behalf of the Tennessee Subclass)**

285.238.     Plaintiff Christian incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

286.239.     Defendant represented to Plaintiff Christian and the Tennessee Subclass that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption, made of wholesome ingredients, and are 100 percent complete and balanced nutrition.

287.240.     In making such representations to Plaintiff Christian and the Tennessee Subclass, Defendant provided false, misleading, partial disclosures, and/or deceptive information regarding the true nature, quality, and ingredients of the Contaminated Dog Foods.

288.241.     At all times relevant herein, Defendant made misrepresentations of material fact to Plaintiff Christian and members of the Tennessee Subclass as a means of concealing the true nature and quality of the Contaminated Dog Foods, claiming it was pure, nutritious, healthy, and quality with no disclosure that the Contaminated Dog Foods were adulterated and contained pentobarbital.

289.242.     Defendant made such representations to Plaintiff Christian and the Tennessee Subclass recklessly, as it knew its representations about the Contaminated Dog Foods were false because the Contaminated Dog Foods are adulterated and contain pentobarbital.

290.243.     Plaintiff Christian and the Tennessee Subclass reasonably placed their trust and justifiable reliance in Defendant's representations that the Contaminated Dog Foods are healthy, safe, pure, high quality, and that they were not adulterated with substances such as

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

pentobarbital. Given the deceptive manner in which Defendant advertised, represented, and otherwise promoted the Contaminated Dog Foods, Plaintiff Christian and the Tennessee Subclass's reliance on Defendant's misrepresentations was justifiable.

291.244. As a direct and proximate result of Defendant's conduct, Plaintiff Christian and the Tennessee Subclass have suffered damages because they purchased Contaminated Dog Foods that were not what Defendant represented and that they would not have purchased at all had they known of the presence of pentobarbital.

292.245. By virtue of Defendant's fraud, Plaintiff Christian and the Tennessee Subclass have been damaged in an amount to be proven at trial or alternatively, seek full refund and/or rescission and disgorgement under this Count.

**COUNT XV**

**(Breach of Implied Warranty of Merchantability, W. Va. Code § 46-2-314, Against Defendant on Behalf of the West Virginia Subclass)**

293. Plaintiff Thomas incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

294. Defendant is a merchant engaging in the sale of goods, such as the Contaminated Dog Foods, to Plaintiff Thomas and the West Virginia Subclass.

295. There was a sale of goods from Defendant to Plaintiff Thomas and the members of the West Virginia Subclass.

296. The purchased product was unfit for its ordinary purpose. At all times mentioned herein, Defendant manufactured or supplied the Contaminated Dog Foods, and prior to the time the Contaminated Dog Foods were purchased by Plaintiff Thomas and the West Virginia Subclass, Defendant impliedly warranted to them that the Contaminated Dog Foods were of merchantable quality, fit for their ordinary purpose (consumption by dogs), and conformed to the promises and affirmations made by Defendant regarding the Contaminated Dog Foods, including that the food was pure, quality, healthy, and safe for consumption, made of wholesome ingredients, and was 100 percent complete and balanced nutrition.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

297.   Defendant marketed its Contaminated Dog Foods with the intent and reasonable expectation that Plaintiff Thomas and the West Virginia Subclass would justifiably rely on their representations and affirmations regarding the Contaminated Dog Foods.

298.   Plaintiff Thomas and the members of the West Virginia Subclass relied on Defendant's representations and affirmations with respect to the Contaminated Dog Foods' quality, ingredients, and fitness for consumption when deciding what dog food to purchase.

299.   Because the Contaminated Dog Foods contain pentobarbital, they were not fit for their ordinary purpose, consumption by dogs, and did not conform to the Defendant's representations and affirmations of fact when Plaintiff Thomas and the members of the West Virginia Subclass purchased the Contaminated Dog Foods.

300.   Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods.

301.   Defendant failed to disclose information about the hazards present in the Contaminated Dog Foods.

302.   As a result of Defendant's conduct, Plaintiff Thomas and the members of the West Virginia Subclass have suffered actual damages in that they purchased Contaminated Dog Foods that were not what Defendant represented.

303.   Plaintiff Thomas, on behalf of himself and the West Virginia Subclass, seeks actual damages for Defendant's breach of warranty.

## COUNT XVI

### (Breach of Express Warranty, Tex. Bus. & Com. Code § 2.313(a), Against Defendant on Behalf of the Texas Subclass)

304.   Plaintiff Brown incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

305. ~~As set forth herein, Defendant made express representations to Plaintiff Brown and the Texas Subclass that the Contaminated Dog Foods are pure, quality, healthy, and safe for consumption, made of wholesome ingredients, and are 100 percent complete and balanced nutrition.~~

306. ~~Defendant also made express representations to Plaintiff Brown and the Texas Subclass that the Contaminated Dog Foods meet all applicable regulations, including that they are not adulterated dog food, by allowing their sale in various stores throughout the United States.~~

307. ~~These promises became part of the basis of the bargain between the parties and thus constituted express warranties.~~

308. ~~Defendant's representations and warranties were made in connection with the sale of the Contaminated Dog Foods to Plaintiff Brown and the Texas Subclass, who relied on Defendant's representations and warranties regarding the Contaminated Dog Foods when deciding whether to purchase the Defendant's products.~~

309. ~~Defendant knowingly breached the express warranties to Plaintiff Brown and the Texas Subclass by selling them Contaminated Dog Foods that did not conform to Defendant's representations and affirmations because they are adulterated and contain pentobarbital.~~

310. ~~As a direct and proximate result of Defendant's conduct, Plaintiff Brown and the Texas Subclass suffered actual damages in that they purchased Contaminated Dog Foods that were not what Defendant represented and that they would not have purchased at all had they known of the presence of pentobarbital.~~

311. ~~Plaintiff Brown and the members of the Texas Subclass reasonably placed their trust and justifiable reliance in Defendant's representations that the Contaminated Dog Foods are healthy, safe, pure, high quality, and that they were not adulterated with substances such as pentobarbital.~~

312. ~~Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods.~~

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

313. Plaintiff Brown, on behalf of herself and the Texas Subclass, seeks full refund and/or actual damages for Defendant's breach of warranty.

## COUNT XVII

### (Breach of Implied Warranty of Merchantability, Tex. Bus. & Com. Code § 2.314, Against Defendant on Behalf of the Texas Subclass)

314. Plaintiff Brown incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

315. Defendant is a merchant engaging in the sale of goods, such as the Contaminated Dog Foods, to Plaintiff Brown and the Texas Subclass.

316. There was a sale of goods from Defendant to Plaintiff Brown and the members of the Texas Subclass.

317. At all times mentioned herein, Defendant manufactured or supplied the Contaminated Dog Foods, and prior to the time the Contaminated Dog Foods were purchased by Plaintiff Brown and the members of the Texas Subclass, Defendant impliedly warranted to them that the Contaminated Dog Foods were of merchantable quality, fit for their ordinary purpose (consumption by dogs), and conformed to the promises and affirmations made by Defendant regarding the Contaminated Dog Foods, including that the food was pure, quality, healthy, and safe for consumption, made of wholesome ingredients, and were 100 percent complete and balanced nutrition.

318. Because the Contaminated Dog Foods contain pentobarbital, they are not fit for their ordinary purpose, consumption by dogs, and did not conform to the Defendant's representations and affirmations of fact when Plaintiff Brown and the Texas Subclass purchased the Contaminated Dog Foods.

319. Defendant marketed its Contaminated Dog Foods with the intent and reasonable expectation that Plaintiff Brown and the members of the Texas Subclass would justifiably rely on its representations and affirmations regarding the Contaminated Dog Foods.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

320. Plaintiff Brown and the members of the Texas Subclass relied on Defendant's representations and affirmations with respect to the Contaminated Dog Foods' quality, ingredients, and fitness for consumption when deciding what dog food to purchase.

321. Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the Contaminated Dog Foods.

322. As a result of Defendant's conduct, Plaintiff Brown and the members of the Texas Subclass have suffered actual damages in that they purchased Contaminated Dog Foods that were not what Defendant represented and that they would not have purchased at all had they known of the presence of pentobarbital.

323. Plaintiff Brown, on behalf of herself and the Texas Subclass, seeks actual damages for Defendant's breach of warranty.

## COUNT XIIVIII

**(Violations of Maryland's Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq.*, Against Defendant on Behalf of the Maryland Subclass)**

324.246. Plaintiff Collins incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

325.247. This is an action for relief under the Maryland Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq.* ("MCPA").

326.248. Plaintiff Collins and each Maryland Subclass member are each a "consumer," as that term is defined in section 13-101(c) of the Maryland Code, Commercial Law.

327.249. The Contaminated Dog Foods are "merchandise," as that term is defined in section 13-101(f) of the Maryland Code, Commercial Law.

328.250. Defendant is a "merchant," as that term is defined in section 13-101(g) of the Maryland Code, Commercial Law.

329.251. Defendant, Plaintiff Collins, and each Maryland Subclass member are each a "person," as that term is defined in section 13-101(h) of the Maryland Code, Commercial Law.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

330.252. The MCPA states that "[a] person may not engage in any unfair or deceptive trade practice[.]" Md. Code Ann. Com. Law § 13-303. Further, "Any practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." Md. Code Ann Com. Law § 13-302.

331.253. Defendant's conduct alleged herein has violated the MCPA by engaging in the following "unfair or deceptive trade practice" specified under the MCPA:

(a) Md. Code Ann Com. Law § 13-301(1), providing false or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(b) Md. Code Ann Com. Law § 13-301(2), representing that: (i) the Contaminated Dog Foods have a sponsorship, approval, accessory, characteristic, ingredient, use, or benefit which they do not have; (ii) Defendant has sponsorship, approval, status, affiliation, or connection which it does not have; or (iii) the Contaminated Dog Foods are of a particular standard, quality, grade, style, or model which they are not;

(c) Md. Code Ann Com. Law § 13-301(3), failing to state a material fact if the failure deceives or tends to deceive;

(d) Md. Code Ann Com. Law § 13-301(5), advertising or offering consumer goods without the intent to sell them as advertised or offered; and

(e) Md. Code Ann Com. Law § 13-301(9), deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of material fact with the intent that Plaintiff Collins and the Maryland Subclass rely on the same in connection with: (i) the promotion or sale of the Contaminated Dog Foods.

332.254. The unconscionable, illegal, unfair, and deceptive acts and practices of Defendant impacts public interest and violate the MCPA.

333.255. As a direct and proximate result of Defendant's conduct, Plaintiff Collins and the Maryland Subclass have been damaged in an amount to be proven at trial, which shall

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

include, but is not limited to, full refund, all compensatory damages, incidental and consequential damages, attorneys' fees, costs, injunctive relief, and other damages allowed by law.

## COUNT XIII~~X~~

**(Fraudulent Misrepresentation Against Defendant on Behalf of the Maryland Subclass for Relief Other Than Restitution and Disgorgement)**

~~334.~~256.    Plaintiff Collins incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

~~335.~~257.    As alleged more fully herein, at the time Defendant sold the Contaminated Dog Foods to Plaintiff Collins and Maryland Subclass Members, it knew the Contaminated Dog Foods were adulterated with pentobarbital.

~~336.~~258.    At all times relevant herein, Defendant made misrepresentations of material fact to Plaintiff Collins and Maryland Subclass Members as a means of concealing the true nature and quality of the Contaminated Dog Foods, claiming it was pure, nutritious, healthy, and pure quality with no disclosure that the Contaminated Dog Foods were in fact adulterated and contained pentobarbital.

~~337.~~259.    Defendant falsely represented to and/or concealed material facts from Plaintiff Collins and Maryland Subclass Members, including, but not limited to:

        (a)    the true nature and quality of the Contaminated Dog Foods;

        (b)    the inclusion of pentobarbital in the Contaminated Dog Foods; and

        (c)    that the Contaminated Dog Foods were not lawfully sold as labelled and packaged as they were adulterated.

~~338.~~260.    Defendant had a duty to disclose these facts, regardless of the existence of privity, by virtue of (a) Defendant's exclusive knowledge as to the true nature and ingredients of the Contaminated Dog Foods; (b) Defendant's awareness that Plaintiff Collins and members of the Maryland Subclass were not reasonably likely to discover these facts; (c) Defendant's active concealment of those facts from Plaintiff Collins and the Maryland Subclass (by, among other

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

things, making the false representations described above); and (d) Defendant's statutory and common-law obligations to disclose material information to the consumers as alleged herein.

339.261.    Plaintiff Collins and members of the Maryland Subclass would have acted differently had Defendant disclosed this information to them and allowed them to make a fully-informed decision before they purchased the Contaminated Dog Foods.

340.262.    These false representations were material to Plaintiff Collins and the Maryland Subclass.

341.263.    Defendant intentionally and knowingly made these misrepresentations to induce Plaintiff Collins and the Maryland Subclass to purchase its Contaminated Dog Foods.

342.264.    Defendant knew that its representations about the Contaminated Dog Foods were false in that the Contaminated Dog Foods were adulterated with pentobarbital. Defendant allowed its packaging, labels, advertisements, promotional materials, and website to intentionally mislead consumers, such as Plaintiff Collins and the Maryland Subclass.

343.265.    Plaintiff Collins and the Maryland Subclass were ignorant of the falsity of the representations made by Defendant about the Contaminated Dog Foods.

344.266.    Plaintiff Collins and the Maryland Subclass did in fact rely on the truth of these misrepresentations and purchased the Contaminated Dog Foods to their detriment. Given the deceptive manner in which Defendant advertised, represented, and otherwise promoted the Contaminated Dog Foods, Plaintiff Collins and the Maryland Subclass's reliance on Defendant's misrepresentations was justifiable.

345.267.    As a direct and proximate result of Defendant's concealment and suppression of material facts, Plaintiff Collins and the Maryland Subclass have sustained damage by, among other things, paying for Contaminated Dog Foods that were adulterated and unlawfully sold to consumers, rendering the Contaminated Dog Foods of zero or *de minimis* value.

346.268.    Plaintiff Collins and the Maryland Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief allowed by law.

# COUNT XIV~~X~~

### (Breach of Express Warranty, Md. Code Com. Law § 2-313, Against Defendant on Behalf of the Maryland Subclass for Relief Other Than Restitution and Disgorgement)

~~347.~~269.  Plaintiff Collins incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

~~348.~~270.  Defendant marketed and sold its Contaminated Dog Foods into the stream of commerce with the intent that the Contaminated Dog Foods would be purchased by Plaintiff Collins and the Maryland Subclass.

~~349.~~271.  As set forth herein, Defendant made express representations to Plaintiff Collins and the Maryland Subclass that the Contaminated Dog Foods are pure, quality, healthy, safe for consumption, and provide 100 percent complete and balanced nutrition.

~~350.~~272.  Defendant also made express representations to Plaintiff Collins and the Maryland Subclass that the Contaminated Dog Foods meet all applicable regulations, including that they are not adulterated dog food, by allowing their sale in various stores throughout the United States.

~~351.~~273.  These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

~~352.~~274.  There was a sale of goods, the Contaminated Dog Foods, from Defendant to Plaintiff Collins and the Maryland Subclass members.

~~353.~~275.  On the basis of these express warranties, Defendant sold the Contaminated Dog Foods to Plaintiff Collins and the Maryland Subclass.

~~354.~~276.  Defendant knowingly breached the express warranties by selling Contaminated Dog Foods that were adulterated and contained pentobarbital.

~~355.~~277.  Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a source of protein or meat by-product in the Contaminated Dog Foods.

356.278.    Plaintiff Collins and the Maryland Subclass relied on Defendant's express warranties regarding the Contaminated Dog Foods in deciding whether to purchase Defendant's products.

357.279.    Privity exists because Defendant expressly warranted to Plaintiff Collins and the Maryland Subclass that the Contaminated Dog Foods were pure, quality, healthy, safe for consumption, unadulterated, and provided 100 percent complete and balanced nutrition.

358.280.    Defendant's express warranties extend to Plaintiff Collins and the Maryland Subclass, who are users of the Contaminated Dog Foods and/or persons affected thereby and it is reasonable to expect that they may use and/or be affected by the Contaminated Dog Foods and be injured by the breach of the warranty.

359.281.    As a direct and proximate result of Defendant's conduct, Plaintiff Collins and the Maryland Subclass sustained damages as they paid money for Contaminated Dog Foods that were not what Defendant represented and were sold in violation of applicable regulations and laws.

360.282.    Plaintiff Collins and the Maryland Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their express warranties and resulting breach.

## **COUNT XVXI**

**(Violations of Washington's Unfair Business Practices and Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.*, Against Defendant on Behalf of the Washington Subclass on Grounds Other Than Affirmative Misrepresentation for Relief Other Than Restitution and Disgorgement)**

361.283.    Plaintiff Mayo incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

362.284.    This is an action for relief under the Washington Unfair Business Practices and Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, et seq. ("WCPA").

363.285.     Defendant, Plaintiff Mayo and each Washington Subclass member are each a "person," as that term is defined in section 19.86.010(1) of the Revised Code of Washington.

364.286.     Defendant engaged in "trade" or "commerce" under Washington Code section § 19.86.010(2)

365.287.     The WCPA states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Wash. Rev. Code § 19.86.020.

366.288.     Defendant engaged in unfair competition and unfair, unlawful, or fraudulent business practices by making material representations that the Contaminated Dog Foods were pure, quality, healthy, and safe for consumption and by knowingly, intentionally, and/or negligently concealing from Plaintiff Mayo and the Washington Subclass the fact that the Contaminated Dog Foods were adulterated with pentobarbital, which was not readily discoverable. Defendant should have disclosed such information because it was in a superior position to know the facts regarding the true make-up and quality of the Contaminated Dog Foods. Plaintiff Mayo and the Washington Subclass could not reasonably be expected to learn or discover the true facts regarding the make-up and/or quality of the Contaminated Dog Foods.

367.289.     The unconscionable, illegal, unfair and deceptive acts and practices of Defendant impacts public interest and violate the WCPA.

368.290.     Pursuant to section 19.86.095 of the WCPA, Plaintiff Mayo will serve the Washington Attorney General with a copy of this complaint as Plaintiff Mayo and the Washington Subclass members seek injunctive relief.

369.291.     As a direct and proximate result of Defendant's conduct, Plaintiff Mayo and the Washington Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, full refund, attorneys' fees, costs, treble damages, injunctive relief, and other damages allowed by law.

**COUNT XXII**

**(Fraudulent Misrepresentation Against Defendant on Behalf of the Washington Subclass)**

370.   Plaintiff Mayo incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

371.   As alleged more fully herein, at the time Defendant sold the Contaminated Dog Foods to Plaintiff Mayo and Washington Subclass Members, it knew it was adulterated with pentobarbital.

372.   At all times relevant herein, Defendant made misrepresentations of material fact to Plaintiff Mayo and Washington Subclass Members as a means of concealing the true nature and quality of the Contaminated Dog Foods, claiming it was pure, nutritious, healthy, and pure quality with no disclosure that the Contaminated Dog Foods were adulterated and contain pentobarbital.

373.   Defendant falsely represented to and/or concealed material facts from Plaintiff Mayo and Washington Subclass Members, including, but not limited to:

(a)   the true nature and quality of the Contaminated Dog Foods;

(b)   the inclusion of pentobarbital in the Contaminated Dog Foods; and

(c)   that the Contaminated Dog Foods were not lawfully sold as labelled and packaged as they were adulterated.

374.   Defendant had a duty to disclose these facts, regardless of the existence of privity, by virtue of (a) Defendant's exclusive knowledge as to the true nature and ingredients of the Contaminated Dog Foods; (b) Defendant's awareness that Plaintiff Mayo and members of the proposed Washington Subclass were not reasonably likely to discover these facts; (c) Defendant's active concealment of those facts from Plaintiff Mayo and the proposed Washington Subclass (by, among other things, making the false representations described above); and (d) Defendant's statutory and common-law obligations to disclose material information to the consumers as alleged herein.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

375. Plaintiff Mayo and members of the Washington Subclass would have acted differently had Defendant disclosed this information to them and allowed them to make a fully-informed decision before they purchased the Contaminated Dog Foods.

376. These false representations were material to Plaintiff Mayo and the Washington Subclass.

377. Defendant intentionally and knowingly made these misrepresentations to induce Plaintiff Mayo and the Washington Subclass to purchase its Contaminated Dog Foods.

378. Defendant knew that its representations about the Contaminated Dog Foods were false in that the Contaminated Dog Foods were adulterated with pentobarbital. Defendant allowed its packaging, labels, advertisements, promotional materials, and website to intentionally mislead consumers, such as Plaintiff Mayo and the Washington Subclass.

379. Plaintiff Mayo and the Washington Subclass were ignorant of the falsity of the representations made by Defendant about the Contaminated Dog Foods.

380. Plaintiff Mayo and the Washington Subclass did in fact rely on the truth of these misrepresentations and purchased the Contaminated Dog Foods to their detriment. Given the deceptive manner in which Defendant advertised, represented, and otherwise promoted the Contaminated Dog Foods, Plaintiff Mayo and the Washington Subclass's reliance on Defendant's misrepresentations was justifiable.

381. As a direct and proximate result of Defendant's concealment and suppression of material facts, Plaintiff Mayo and the Washington Subclass have sustained damage by, among other things, paying for Contaminated Dog Foods that were adulterated and unlawfully sold to consumers, rendering the Contaminated Dog Foods of zero or *de minimis* value.

382. Plaintiff Mayo and the Washington Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief allowed by law.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT
872279.1

## COUNT XXIII

### (Breach of Express Warranty, Wash. Rev. Code § 62A.2-313, Against Defendant on Behalf of the Washington Subclass)

383. Plaintiff Mayo incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

384. Defendant marketed and sold its Contaminated Dog Foods into the stream of commerce with the intent that the Contaminated Dog Foods would be purchased by Plaintiff Mayo and the Washington Subclass.

385. As set forth herein, Defendant made express representations to Plaintiff Mayo and the Washington Subclass that the Contaminated Dog Foods are pure, quality, healthy, safe for consumption, and provide 100 percent complete and balanced nutrition.

386. Defendant also made express representations to Plaintiff Mayo and the Washington Subclass that the Contaminated Dog Foods meet all applicable regulations, including that they are not adulterated dog food, by allowing their sale in various stores throughout the United States.

387. These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

388. There was a sale of goods, the Contaminated Dog Foods, from Defendant to Plaintiff Mayo and the Washington Subclass members.

389. On the basis of these express warranties, Defendant sold the Contaminated Dog Foods to Plaintiff Mayo and the Washington Subclass.

390. Defendant knowingly breached the express warranties by selling Contaminated Dog Foods that were adulterated and contained pentobarbital.

391. Defendant was on notice of this breach as it was aware of the presence of pentobarbital and/or the use of euthanized animals as a source of protein or meat by-product in the Contaminated Dog Foods.

392. Plaintiff Mayo and the Washington Subclass relied on Defendant's express warranties regarding the Contaminated Dog Foods in deciding whether to purchase Defendant's products.

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

393. Privity exists because Defendant fraudulently and/or deceitfully expressly warranted to Plaintiff Mayo and the Washington Subclass that the Contaminated Dog Foods were pure, quality, healthy, safe for consumption, unadulterated, and provided 100 percent complete and balanced nutrition.

394. As a direct and proximate result of Defendant's conduct, Plaintiff Mayo and the Washington Subclass sustained damages as they paid money for Contaminated Dog Foods that were not what Defendant represented and were sold in violation of applicable regulations and laws.

395. Plaintiff Mayo and the Washington Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT XXIV

**(Violation of the Minnesota Commercial Feed Law Minn. Stat. § 25.31, *et seq*. Against Defendant on Behalf of the Minnesota Subclass for Relief Other Than Restitution and Disgorgement)**

396. Plaintiff Jilek incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

397. The Contaminated Dog Foods manufactured, distributed, marketed, and sold by Defendants are "commercial feed" within the meaning of the Minnesota Commercial Feed Law (MCFL).

398. The Contaminated Dog Foods are "misbranded", within the meaning of the MCFL, because it is, as described above, false, misleading, and deceptive with respect to the Contaminated Dog Foods' ingredients, composition, and suitability.

399. The Contaminated Dogs Foods are "adulterated", within the meaning of the MCFL, because:

(a) They contain poisonous and deleterious substances rendering them injurious to the health of pets; and

1  (b)  Their composition and quality fall below and differ from that which their

2  labels purport and represent to process.

3  400.  Defendant's manufacture and distribution of these adulterated and misbranded

4  Contaminated Dog Foods are prohibited by and violations of the MCFL.

5  401.  As a result of Defendant's conduct, Plaintiff Jilek and the Minnesota Subclass have

6  suffered actual damages in that they have purchased Contaminated Dog Foods that are worth less

7  than the price they paid and that they would not have purchased at all had they known of the

8  presence of pentobarbital.  There is an association between Defendant's acts and omissions as

9  alleged herein and the damages suffered by Plaintiff Jilek and the Minnesota Subclass.

10  402.  As a direct and proximate result of Defendant's violations of the MCFL, Plaintiff

11  Jilek and the Minnesota Subclass have suffered actual damages in that they paid money for

12  Contaminated Dog Foods that were not what Defendant represented, and that harm will continue

13  unless Defendant is enjoined from manufacturing, distributing, marketing and selling the

14  misbranded and adulterated Contaminated Dog Foods described herein.

15  403.  Pursuant to Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31, subd.

16  3a, Plaintiff Jilek and the Minnesota Subclass seek full refund, actual damages, equitable relief,

17  attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's

18  violations of the MCFL.

19  **COUNT XXV**

20  **(Violation of Minnesota Unlawful Trade Practices Act Minn. Stat. § 325D.13, *et seq*.**
21  **Against Defendant on behalf of the Minnesota Subclass on Grounds Other Than**
   **Affirmative Misrepresentation for Relief Other Than Restitution and Disgorgement)**
22

23  404.  Plaintiff Jilek incorporates by reference and realleges each and every allegation

24  contained above, as though fully set forth herein.

25  405.  Defendant is a "person" within the meaning of the Minnesota Unlawful Trade

26  Practices Act (MUTPA).

27

28

406. Defendant violated the MUTPA by knowingly misrepresenting the true quality and ingredients of the Contaminated Dog Foods. Specifically, Defendant represented that its Contaminated Dog Foods were pure, quality, healthy, safe, made of wholesome ingredients, and were 100 percent balanced nutrition, which is false and misleading because the Contaminated Dog Foods are adulterated and contain pentobarbital.

407. Defendant knew or should have known that the Contaminated Dog Foods did not have the quality and ingredients described above because they contain pentobarbital.

408. Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Jilek and the Minnesota Subclass with respect to the Contaminated Dog Foods' quality, ingredients, and suitability for consumption by dogs.

409. Defendant intended that Plaintiff Jilek and the Minnesota Subclass would rely on Defendant's misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the Contaminated Dog Foods' quality, ingredients, and suitability for consumption by dogs.

410. Defendant's conduct and omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

411. The facts concealed or not disclosed by Defendant were material facts in that Plaintiff Jilek and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Dog Foods. Had Plaintiff Jilek known the Contaminated Dog Foods did not have the quality and ingredients advertised by Defendant because they contained pentobarbital, she would not have purchased the Contaminated Dog Foods.

412. Defendant intended that Plaintiff Jilek would rely on the deception by purchasing the Contaminated Dog Foods, unaware of the undisclosed material facts about the presence of pentobarbital. This conduct constitutes consumer fraud.

413. As a result of Defendant's conduct, Plaintiff Jilek and the Minnesota Subclass have suffered actual damages in that they have purchased Contaminated Dog Food that is worth less

SECOND THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

than the price they paid and that they would not have purchased at all had they known of the presence of pentobarbital. There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiff Jilek and the Minnesota Subclass.

414. As a direct and proximate result of Defendant's violations of the MUTPA, Plaintiff Jilek and the Minnesota Subclass have been injured, and that harm will continue unless Defendant is enjoined from misrepresenting the quality and ingredients of their Contaminated Dog Foods described herein.

415. Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.15, Plaintiff Jilek and the Minnesota Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

**COUNT XXVI**

**(Violation of Minnesota False Statement in Advertising Act Minn. Stat. § 325F.67, *et seq*. Against Defendant on Behalf of the Minnesota Subclass On Grounds Other Than Affirmative Misrepresentation for Relief Other Than Restitution and Disgorgement)**

416. Plaintiff Jilek incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

417. Plaintiff Jilek purchased "goods", specifically the Contaminated Dog Foods discussed herein, is a "person" within the meaning of the False Statement in Advertising Act (FSAA).

418. Plaintiff Jilek purchased the Contaminated Dog Foods through advertising that contained numerous material assertions representations, and statements of fact made, published, disseminated, circulated, and placed before the public by Defendant that were untrue, deceptive, and misleading.

419. By engaging in the conduct herein, Defendant violated and continue to violate Minn. Stat. § 325F.67.

420.    Defendant's misrepresentations, knowing omissions, and use of other sharp business practices include, by way of example, ~~concealment and/or failure to disclose that the Contaminated Dog Foods are adulterated and contain pentobarbital~~representations that the Contaminated Dog Foods are pure, quality, healthy, safe, made of wholesome ingredients, and were 100 percent balanced nutrition.

421.    Defendant, including its agents and distributors, also made untrue, deceptive, and misleading assertions and representations about the Contaminated Dog Foods by ~~concealing and/or failing to disclose that the Contaminated Dog Foods are adulterated and contain pentobarbital~~making and repeating the various statements about the alleged quality, characteristics, and capabilities of the Contaminated Dog Foods referenced herein.

422.    As a result of Defendant's conduct, Plaintiff Jilek and the Minnesota Subclass have suffered actual damages in that they have purchased Contaminated Dog Foods that is worth less than the price they paid and that they would not have purchased at all had they known of the presence of pentobarbital.  There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiff Jilek and the Minnesota Subclass.

423.    As a direct and proximate result of Defendant's violations of the FSAA, Plaintiff Jilek and the Minnesota Subclass have been injured, and that harm is likely to continue unless Defendant is enjoined from misrepresenting the ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs of their Contaminated Dog Foods described herein.

424.    Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.67, Plaintiff Jilek and the Minnesota Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the FSAA.

**COUNT XXVII**

**(Violation of Minnesota Prevention of Consumer Fraud Act Minn. Stat. § 325F.68,**
***et seq*. Against Defendant on Behalf of the Minnesota Class On Grounds Other**

872279.1

425. Plaintiff Jilek incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

426. Plaintiff Jilek is a resident of the State of Minnesota.

427. Defendant is a "person" within the meaning of the Minnesota Prevention of Consumer Fraud Act (MPCFA).

428. Defendant's advertisements and representations with respect to the Contaminated Dog Foods were made in connection with the sale of the Contaminated Dog Foods to Plaintiff Jilek and the Minnesota Subclass.

429. Defendant knowingly acted, used, and employed fraud, false pretenses, false promises, misrepresentations, misleading statements, and deceptive practices in connection with the sale of their Contaminated Dog Foods. Specifically, Defendant concealed, failed to disclose, and omitted that the Contaminated Dog Foods are adulterated and contain pentobarbitalfalsely represented that its Contaminated Dog Foods are pure, quality, healthy, safe, made of wholesome ingredients, and were 100 percent balanced nutrition.

430. Defendant intended for Plaintiff Jilek and the Minnesota Subclass to rely on and accept as true these advertisements and representations omissions in deciding whether to purchase the Contaminated Dog Foods.

431. Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Contaminated Dog Foods' quality, ingredients, fitness for consumption and, by extension, the true value of the Contaminated Dog Foods. Plaintiff Jilek and the Minnesota Subclass relied on, and were in fact deceived by, Defendant's advertisements and representations omissions with respect to the Contaminated Dog Foods' quality, ingredients, and fitness for consumption in deciding to purchase them over competitors' dog foods.

432. As a result of Defendant's conduct, Plaintiff Jilek and the Minnesota Subclass have suffered actual damages in that they have purchased Contaminated Dog Foods that is worth less

than the price they paid and that they would not have purchased at all had they known of the presence of pentobarbital. There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiff Jilek and the Minnesota Subclass.

433. As a direct and proximate result of Defendant's violations of the MPCFA, Plaintiff Jilek and the Minnesota Subclass have been injured, and that harm is likely to continue unless Defendant is enjoined from misrepresenting the quality, ingredients, and fitness for consumption of their Contaminated Dog Foods described herein.

434. Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.67, Plaintiff Jilek and the Minnesota Subclass seek full refund, actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MPCFA.

## COUNT XXVII

**(Violations of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, Against Defendant on Behalf of the New York Subclass for Relief Other Than Restitution, Disgorgement, and Punitive Damages)**

292. Plaintiff Schirripa incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

293. New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

294. In its sale of goods throughout New York, Defendant conducts business and trade within the meaning and intendment of New York General Business Law § 349.

295. Plaintiff Schirripa and members of the New York Subclass are consumers who purchased products from Defendant.

296. Defendant violated N.Y. Gen. Bus. Law § 349 by representing that its Contaminated Dog Foods were pure, quality, healthy, safe, made of wholesome ingredients, and 100 percent balanced nutrition, which was deceptive because the Contaminated Dog Foods were adulterated and contained pentobarbital.

440.297.    Defendant intentionally represented that the Contaminated Dog Foods were of a particular standard, grade, or quality when they were in fact adulterated and not fit for consumption.

441.298.    The facts that Defendant concealed or misrepresented were material in that Plaintiff Schirripa and any reasonable consumer would have considered them when deciding whether to purchase the Contaminated Dog Foods.

442.299.    Defendant's conduct and omissions described herein repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

443.300.    Defendant has engaged and continues to engage in deceptive conduct in violation of the New York General Business Law.

444.301.    Defendant's misrepresentations and deceptive acts or practices resulted in Plaintiff Schirripa and the New York Subclass suffering actual damages when they purchased Contaminated Dog Foods that were worth less than the price paid and that they would not have purchased at all had they known of the presence of pentobarbital.

445.302.    Defendant intended for Plaintiff Schirripa and the members of the New York Subclass to rely on its deceptive misrepresentations and conduct when purchasing its Contaminated Dog Foods.

446.303.    As a direct and proximate result of these violations, Plaintiff Schirripa and the New York Subclass have been harmed, and that harm will continue unless Defendant is enjoined from misrepresenting the quality and ingredients of its Contaminated Dog Foods described herein.

447.304.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff Schirripa and the New York Subclass seek injunctive and declaratory relief, full refund, actual and punitive damages, and attorneys' fees.

872279.1

## COUNT XVII~~XIX~~

**(Violations of New York False Advertising Law, N.Y. Gen. Bus. Law § 350, Against Defendant on Behalf of the New York Subclass for Relief Other Than Restitution, Disgorgement, and Punitive Damages)**

~~448.~~305.    Plaintiff Schirripa incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

~~449.~~306.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

~~450.~~307.    Pursuant to N.Y. Gen. Bus. Law § 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect."

~~451.~~308.    Defendant's claims that its Contaminated Dog Foods were healthy and safe for consumption were literally false and likely to deceive the public.

~~452.~~309.    Defendant's claims that its Contaminated Dog Foods were pure, quality, healthy, safe for consumption, and 100 percent complete and balanced nutrition were untrue or misleading because such claims failed to disclose that the Contaminated Dog Foods were adulterated with pentobarbital.

~~453.~~310.    Defendant knew or should have known that such claims were false or misleading.

~~454.~~311.    Such false and misleading claims and representations made by Defendant were material in that Plaintiff Schirripa and any reasonable consumer would have considered them when deciding whether to purchase the Contaminated Dog Foods.

~~455.~~312.    Defendant, including its agents and distributors, made untrue, deceptive, and misleading assertions and representations about the alleged quality, characteristics, and nature of the Contaminated Dog Foods.

~~456.~~313.    Defendant's conduct caused Plaintiff Schirripa and the New York Subclass to suffer actual damages when they purchased the Contaminated Dog Foods that were worth less

~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

than the price paid and that they would not have purchased at all had they known of the presence of pentobarbital.

457.314. As a direct and proximate result of Defendant's violation of N.Y. Gen. Bus. Law § 350, Plaintiff Schirripa and the members of the New York Subclass have been injured, and that harm will continue unless Defendant is enjoined from misrepresenting the quality, ingredients, standards, and suitability for consumption by dogs of its Contaminated Dog Foods.

458.315. Pursuant to N.Y. Gen. Bus. Law § 350, *et seq.*, Plaintiff Schirripa and the members of the New York Subclass seek injunctive and declaratory relief, full refund, actual and punitive damages, and attorneys' fees.

### COUNT XXX
#### (Negligence Against Defendant on Behalf of the Classes)

459. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

460. Defendant's conduct is negligent per se.

461. As set forth above and below, Defendant violated its statutory duties under numerous statutes to not sell adulterated or misbranded dog food by falsely representing the Contaminated Dog Foods' true quality and not disclosing the high risk of pentobarbital inclusion.

462. Defendant's violations of these statutes is negligence per se and was a substantial factor in the harm suffered by Plaintiffs and the Classes, including purchasing a product with *de minimis* value.

463. As set forth above, such laws were intended to ensure that a companys claims about its products are truthful and accurate, prevent misbranded and adulterated pet foods from entering the stream of commerce, and to preserve life and prevent injury to Plaintiffs' pets.

464. By virtue of Defendant's negligence, Plaintiffs and the Classes have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper Class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendant to bear the costs of Class notice;

B.    An order enjoining Defendant from selling the Contaminated Dog Foods until pentobarbital is removed;

C.    An order enjoining Defendant from selling the Contaminated Dog Foods in any manner;

D.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative corrective action, such as recalling existing products, adequately testing for pentobarbital moving forward, and disclosing on its packaging that its products are tested to ensure that they are not adulterated;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.    An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of California's Unfair Competition Law, FAL, CLRA, or any state law violation alleged herein, plus pre- and post-judgment interest thereon;

G.    An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.    An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

I.    An order requiring Defendant to pay punitive damages on any count so allowable;

J.    An order requiring Defendant to pay full refund and/or rescissory damages;

1    K.    An order awarding attorneys' fees and costs to Plaintiffs, the Class, and the

2  Subclasses; and

3    L.    An order providing for all other such equitable relief as may be just and proper.

4    **JURY DEMAND**

5    Plaintiffs hereby demand a trial by jury on all issues so triable.

6  Dated: ~~December 6, 2019~~April 21, 2021    LOCKRIDGE GRINDAL NAUEN P.L.L.P.
7                                               ROBERT K. SHELQUIST (*pro hac vice*)
                                                REBECCA A. PETERSON (241858)
8

9                                                     */s Rebecca Peterson*
                                                REBECCA A. PETERSON

10                                              100 Washington Avenue South, Suite 2200
11                                              Minneapolis, MN 55401
                                                Telephone: (612) 339-6900
12                                              Facsimile: (612) 339-0981
                                                E-mail: rkshelquist@locklaw.com
13                                                      rapeterson@locklaw.com

14                                              Lead Counsel for Plaintiffs

15                                              ROBBINS LLP
16                                              KEVIN A. SEELY (199982)
                                                ~~STEVEN M. MCKANY (271405)~~
17                                              5040 Shoreham Place
                                                San Diego, CA 92122
18                                              Telephone: (619) 525-3990
19                                              Facsimile: (619) 525-3991
                                                E-mail:  kseely@robbinsllp.com
20                                                      ~~smckany@robbinsllp.com~~

21                                              GUSTAFSON GLUEK, PLLC
22                                              DANIEL E. GUSTAFSON (*pro hac vice*)
                                                KARLA M. GLUEK
23                                              ~~RAINA C. BORRELLI (*pro hac vice*)~~
                                                Canadian Pacific Plaza
24                                              120 South 6th Street, Suite 2600
                                                Minneapolis, MN 55402
25                                              Telephone: (612) 333-8844
26                                              Facsimile: (612) 339-6622
                                                E-mail: dgustafson@gustafsongluek.com
27                                              kgluek@gustafsongluek.com
                                                ~~rborrelli@gustafsongluek.com~~
28
                                                - 98 -        Lead Case No. 4:18-cv-00861-JSW
                                      ~~SECOND~~ THIRD AMENDED CONSOLIDATED COMPLAINT

872279.1

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA (*pro hac vice*)
KATHERINE VAN DYCK (*pro hac vice*)
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com


LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA (*pro hac vice*)
SUSANA CRUZ HODGE (*pro hac vice*)
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

WEXLER WALLACE LLP
Kenneth A. Wexler
Michelle Perkovic
55 West Monroe St., Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
E-mail: kaw@wexlerwallace.com
mp@wexlerwallace.com

WEXLER WALLACE LLP
Mark J. Tamblyn
333 University Avenue, Suite 200
Sacramento, California 95825
T: (916) 565-7692
F: (312) 346-0022
Email: mjt@ wexlerwallace.com

Plaintiffs' Executive Committee